UNITED STATES of America, Appellee,

v.

COUNTY OF ARLINGTON, VIRGINIA, Appellant.

and

Bennie L. Fletcher, Jr., Treasurer of the County of Arlington, Virginia, Defendant.

UNITED STATES of America, Appellant,

v.

COUNTY OF ARLINGTON, VIRGINIA, and Bennie L. Fletcher, Jr., Treasurer of the County of Arlington, Virginia, Appellees.

Nos. 81–1094, 81–1125.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1981.

Decided Feb. 1, 1982.

John J. McCarthy, Tax Division, Dept. of Justice, Washington, D. C. (Justin W. Williams, U. S. Atty., Alexandria, Va., John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, David English Carmack, Tax Division, Dept. of Justice, Washington, D. C., on brief), for appellant.

Charles G. Flinn, Deputy County Atty., Arlington, Va. (Jerry K. Emrich, County Atty., Arlington, Va., on brief), for appellees.

Before BUTZNER and SPROUSE, Circuit Judges, FIELD, Senior Circuit Judge.

BUTZNER, Circuit Judge:

This appeal involves the tax status of an apartment building owned by the German Democratic Republic (GDR) in Arlington County, Virginia. The district court ruled (1) the county could not assess taxes on the property after May 4, 1979; (2) the property was subject to a tax lien for 1977, 1978, and part of 1979, which the county could presently execute; (3) the United States was collaterally estopped from litigating whether the property is exempt from taxes assessed prior to May 4, 1979. We affirm the judgment of the district court on the first issue, reverse with respect to the second and third issues, and remand the case for further proceedings.

I

On September 4, 1974, the United States and the German Democratic Republic entered into an agreement which established bilateral diplomatic relations.[1] In 1976, the GDR purchased an apartment building in Arlington County, Virginia, to house the staff of its diplomatic mission and their families.

In 1978, the county brought suit against the GDR seeking a judgment in the amount of unpaid real estate taxes for 1977 and the declaration of a tax lien. The GDR appeared specially to contest the district court's jurisdiction. The United States, though notified of the suit, did not intervene because State Department officials then doubted that the property was exempt from taxes. In an order entered September

---

1. Agreed Minute on Negotiations Concerning the Establishment of Diplomatic Relations, 25 U.S.T. 2597, T.I.A.S. No. 7937.

6, 1978, the district court concluded that it had jurisdiction under the Foreign Sovereign Immunities Act of 1976 because "the nature of the course of conduct being carried on by the [GDR] in its ownership of the immovable property subject to this action is commercial in character . . . [and] [t]he action also places in issue rights in immovable property situated in the United States."[2] The court entered judgment for the county in the amount of the taxes due on the property with interest and declared the property was subject to a tax lien imposed by Va.Code § 58–762.

The GDR then protested to the State Department that it could not accept the judgment obtained by the county because the GDR was immune from the jurisdiction of United States courts and the suit was impermissible according to the principles of international law. Upon further consideration, the State Department concluded that the property was not taxable. Accordingly, the United States and the GDR entered into an agreement of May 4, 1979, which provides in part:

[A]n agreement exists between the Government of the United States of America and the Government of the German Democratic Republic with regard to the reciprocal exemption from real estate taxes for property owned, now or in the future, by the Government of the German Democratic Republic and by the Government of the United States, when such property is used exclusively for purposes of their diplomatic missions, including residences for the staff of their diplomatic missions and members of their families forming part of their households. The effective date of said agreement is May 4, 1979.

Notwithstanding this agreement, the county continued to tax the property.

2. Pub.L.No. 94–583, 90 Stat. 2891, codified as 28 U.S.C. §§ 1330, 1332, 1391, 1441, 1602–11.
 Section 1605(a)(2) and (4), on which the district court relied, provides in part:
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
 . . . .

At the request of the Department of State, the Attorney General filed this action requesting (1) a declaratory judgment that the property was exempt from the county tax since its purchase by the GDR, (2) the voiding of all assessments and liens affecting the property, and (3) an injunction prohibiting further attempts to collect such taxes from the property or the German government. The district court held that the May 4, 1979, agreement exempted the property from taxes from that date. The court ruled, however, that the United States was collaterally estopped by the 1978 judgment from relitigating the issue of prior tax liability. Consequently, the court ruled that the property was subject to an enforceable lien for taxes assessed from 1977 until May 4, 1979.

II

The county contends that the United States was required by Federal Rule of Civil Procedure 19 to join the GDR. Without joinder, the county asserts, the district court could not afford it complete relief against the GDR. It suggests that even if the judgment is affirmed, it may have to initiate another action against the GDR to collect taxes for 1978 and part of 1979.

 We cannot accept the county's argument. The United States did not institute this action simply to assert the claims of the GDR. The complaint discloses that the United States sued to vindicate its own policy and authority:

This action is brought by the United States at the request of the Department of State, an agency of the United States, (1) to protect the sovereign rights and interests of the United States, (2) to prevent embarrassment of relations between the United States and foreign nations, and (3) to enforce the laws of the United States.

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; . . .
 . . . .
(4) in which rights . . . in immovable property situated in the United States are in issue
 . . . .

The United States can sue to enforce its policies and laws, even when it has no pecuniary interest in the controversy. *See United States v. Arlington County*, 326 F.2d 929, 932 (4th Cir. 1964). This principle has been invoked to enable the United States to honor its treaty obligations to a foreign state. *Sanitary District v. United States*, 266 U.S. 405, 425–26, 45 S.Ct. 176, 178, 69 L.Ed. 352 (1925). And it has been applied to allow the United States to seek redress against a municipality that taxed a foreign government's property in contravention of the laws of the United States. *United States v. City of Glen Cove*, 322 F.Supp. 149, 152–53 (E.D.N.Y.1971), *aff'd per curiam*, 450 F.2d 884 (2d Cir. 1971).

■ Moreover, the county's argument misconstrues rule 19(a)(1). The rule provides that a person shall be joined if feasible where his absence precludes "complete relief ... among those already parties." " 'Complete' relief refers to relief as between the persons already parties, not as between a party and the absent person whose joinder is sought ...." 3A Moore's Federal Practice ¶ 19.07–1[1] at 19–128; *see also Morgan Guaranty Trust Co. of New York v. Martin*, 466 F.2d 593, 598 (7th Cir. 1972). Complete resolution of the dispute between the United States and Arlington County does not require the joinder of the GDR.

We therefore conclude that the GDR was not a necessary party to this action, and the district court did not commit error by proceeding without requiring its joinder.

### III

The county assigns error to the district court's ruling that the agreement of May 4, 1979, between the United States and the GDR exempted the apartment from taxation after that date. It contends that no officer of the United States was authorized to enter into this agreement.

■ We conclude that the district court did not err by upholding the validity of the 1979 agreement. The President is empowered to recognize the government of a foreign state. *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938). This authority is not confined to the act of recognition. Among the principal cases dealing with the scope of this power are *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), which upheld the validity of an assignment and agreement for the settlement of claims incident to the President's recognition of the Soviet Union. In *Belmont*, 301 U.S. at 330–31, 57 S.Ct. at 760–61, the Court said:

> The recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted. Governmental power over internal affairs is distributed between the national government and the several states. Governmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government.... [A]n international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations.

The Court reiterated these principles in *Pink*, 315 U.S. at 229–30, 62 S.Ct. at 565:

> Recognition is not always absolute; it is sometimes conditional. Power to remove such obstacles to full recognition as settlement of claims of our nationals certainly is a modest implied power of the President who is the "sole organ of the federal government in the field of international relations." Effectiveness in handling the delicate problems of foreign

relations requires no less. Unless such a power exists, the power of recognition might be thwarted or seriously diluted. No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs is to be drastically revised. (citations omitted)

■ The genesis of the 1979 agreement was the President's recognition of the GDR in 1974. The agreement establishing diplomatic relations stipulated:

> The two governments will, in supplementation of the provisions of the Vienna Convention on Diplomatic Relations and on the basis of reciprocity, accord full diplomatic privileges and immunities to those members of the administrative and technical staffs and their families who are citizens of the sending State.[3]

It is apparent that the 1979 agreement for tax exemption was ancillary to the 1974 agreement for the recognition of the GDR. Application of the principles derived from *Belmont* and *Pink* establish that the executive branch was authorized to enter into the 1979 agreement.

Our conclusion is buttressed by Section 4 of the Diplomatic Relations Act of 1978, 22 U.S.C. § 254c. This statute provides:

> The President may, on the basis of reciprocity and under such terms and conditions as he may determine, specify privileges and immunities for members of the mission, their families, and the diplomatic couriers of any sending state which result in more favorable treatment or less favorable treatment than is provided under the Vienna Convention.[4]

The county contends that this statute is inapplicable because it refers to privileges and immunities of individuals and not those of the foreign state which they serve.

Although the county's argument is consistent with a literal reading of the statute, we believe that Congress did not intend to limit the previously existing power of the President to deal with foreign states. Courts long have recognized that diplomatic immunity primarily serves the needs of the foreign sovereign. *See The EXCHANGE,* 11 U.S. (7 Cranch) 116, 138, 3 L.Ed. 287 (1812). The privilege extended to an individual diplomat is merely incidental to the benefit conferred on the government he represents. The legislative history of § 254c underscores this view by noting that the statute was enacted to reflect Article 47 of the Vienna Convention.[5] Section 2b of this Article provides that there is no impermissible discrimination between nations when "States extend to each other more favourable treatment than is required by the provisions of the present Convention." Thus, the Convention implicitly views immunity as primarily benefitting governments rather than the individuals who serve them. The immunities conferred pursuant to § 254c, therefore, are indirectly designed to aid both foreign governments and the United States. The Act, we believe, should be construed to permit the President, or his delegate, to do directly what he is authorized to do indirectly.

■ We also reject the county's argument that the 1979 agreement is invalid because the note evidencing the agreement was signed by a Deputy Assistant Secretary of State instead of an Assistant Secretary of State. The county correctly points out that internal State Department rules indi-

---

**3.** 25 U.S.T. 2597, 2598, T.I.A.S. No. 7937. The Vienna Convention, 23 U.S.T. 3227, T.I.A.S. No. 7502, establishes rules for the conduct of diplomatic relations. Article 34 provides that a "diplomatic agent shall be exempt from all dues and taxes, personal or real, national, regional or municipal, except ... (b) dues and taxes on private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission."

**4.** The President delegated this power to the Secretary of State by Executive Order 12101, 43 Fed.Reg. 54,195 (1978).

**5.** S.Rep.No.958, 95th Cong., 2d Sess. 5, *reprinted in* [1978] U.S.Code Cong. & Ad. News 1935, 1939.

cate that such agreements are the province of Assistant Secretaries. It does not follow, however, that the agreement is invalid. The record discloses that the proposal to conclude the agreement with the GDR was brought to the attention of the Deputy Secretary of State. Clearly, as the institution of this suit demonstrates, the agreement was ratified. Under these circumstances, the presumption of official regularity in the conduct of public affairs, which has not been rebutted, is sufficient to sustain the proper execution of the agreement. *See R. H. Stearns Co. v. United States*, 291 U.S. 54, 63, 54 S.Ct. 325, 328, 78 L.Ed. 647 (1934); *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926).

## IV

■ The county contends that even if the 1979 agreement were authorized, it is, nevertheless, invalid. It asserts that the "Constitution does not delegate to any of the three branches of government the authority to exempt from taxation by the state real property owned by a foreign government." The county insists that exemption of a foreign government's property from state taxation is a matter of comity which Virginia in the exercise of its powers may elect to grant or deny. Proceeding with its argument, the county correctly points out that Article X, § 6 of the Virginia Constitution, which exempts certain property from taxation, does not create immunity for any property of a foreign state. These principles, the county concludes, establish that the federal government unconstitutionally infringed on its power to tax.

The starting point for consideration of the county's position is the fundamental concept that the immunity of a foreign state within the territory of another nation depends on the assent of the nation. *The EXCHANGE*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). In a country such as ours that contains multiple political entities, we must, therefore, determine which entity takes precedence—that is, whether the federal government's assent to immunity or

the county's denial of immunity controls. The Supreme Court has provided ample precedent for the answer to this question.

In *United States v. Curtis-Wright Corp.*, 299 U.S. 304, 315–22, 57 S.Ct. 216, 218–21, 81 L.Ed. 255 (1936), the Court explained that the power of the federal government in respect to foreign or external affairs is quite different from the limited powers conferred on it by the Constitution with respect to domestic or internal affairs. The individual colonies, the Court emphasized, never possessed international powers. Before independence, these powers were possessed by the British Crown. The Court then stated, 229 U.S. at 316, 57 S.Ct. at 219:

> As a result of the separation from Great Britain by the colonies acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America.

Consequently, the Court observed, the "investment of the federal government with the powers of external sovereignty did not depend upon affirmative grants of the Constitution." 299 U.S. at 318, 57 S.Ct. at 220.

The principles explained in *Curtis-Wright* were applied by the Court in *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), which involved, just as in the case presently before us, the effect to be given an agreement with a foreign state negotiated by the executive branch as an incident to this country's recognition of the foreign state. There the Court held that the law of New York could not defeat the rights created by the agreement. Expounding this theme, 301 U.S. at 331–32, 57 S.Ct. at 761, the Court said:

> Plainly, the external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning. . . . And while this rule in respect of treaties is established by the express language of cl. 2, Art. VI, of the Constitution, the same rule would result in the case of all international compacts and agreements

from the very fact that complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states.... In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist. Within the field of its powers, whatever the United States rightfully undertakes, it necessarily has warrant to consummate. And when judicial authority is invoked in aid of such consummation, state constitutions, state laws, and state policies are irrelevant to the inquiry and decision. It is inconceivable that any of them can be interposed as an obstacle to the effective operation of a federal constitutional power....

Applying these precedents, we conclude that the 1979 agreement did not unconstitutionally infringe on the county's power to tax. The 1974 and 1979 agreements between the United States and the GDR must be accorded the dignity of formal treaties. The supremacy clause, Article VI, Clause 2 of the Constitution, makes them the "Law of the Land." *United States v. Pink,* 315 U.S. at 230, 62 S.Ct. at 565; *United States v. Belmont,* 301 U.S. at 331, 57 S.Ct. at 761. Consequently, the district court correctly ruled that with respect to taxes assessed after May 4, 1979, the United States' grant of immunity takes precedence over the county's denial of immunity.

*Nevada v. Hall,* 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), does not require a contrary result.[6] That case and others of a similar nature cited by the county dealt with relations among the several states or between a state and the United States arising out of domestic affairs. As the Supreme Court explained, the origin and nature of these relationships are quite different from relations with foreign governments growing out of the international or external affairs of the United States.

V

The United States assigns error to the district court's declaratory judgment that the county can presently enforce a tax lien against the apartment house arising out of taxes owed by the GDR for the period before May 4, 1979.

The relevant provisions of the Foreign Sovereign Immunities Act of 1976 governing execution on the property of a foreign state are codified as 28 U.S.C. §§ 1609 and 1610. Insofar as it is pertinent to this case, § 1609 states that the property "of a foreign state shall be immune from ... execution except as provided in [section] 1610 ..." The germane provisions of § 1610 are:

(a) The property ... of a foreign state ... used for a commercial activity ... shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

....

(2) the property is or was used for the commercial activity upon which the claim is based, or

....

(4) the execution relates to a judgment establishing rights in property—

....

(B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission ....

The legislative history recounts the background of the Act.[7] The Supreme Court formerly recognized the immunity of a foreign state's property from arrest or execution on the basis of the laws and practices

---

6. In *Nevada v. Hall* the Court held that the question of Nevada's immunity from suit in California for an automobile accident caused by Nevada's agent was a matter of comity.

7. H.R.Rep.No.1487, 94th Cong., 2d Sess. 8, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6606–07.

of nations, which the Court perceived to be also the law of the United States. *The EXCHANGE*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). This immunity was extended to the property of a foreign government engaged in a commercial enterprise. *Berizzi Bros. Co. v. PESARO*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). Gradually, however, the Court relied more on the policy and practices of the State Department to determine whether immunity was appropriate. *See, e.g., Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945). Responding to the increase of commerce between Americans and foreign governments or their trading companies, the State Department in 1952 adopted a restrictive principle of sovereign immunity.[8] Congress clearly intended to adopt the State Department's policy. The House Report states:

> [T]he bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U. S. Government in foreign courts.[9]

The legislative history also discloses that the doctrine of restrictive immunity as embodied in the Act was not intended to deprive a foreign government's property of immunity from execution when it is used for maintaining a mission. The House Report states:

> [Section 1610(a)(4)] would deny immunity from execution against property of a foreign state which is used for a commercial activity in the United States and is either acquired by succession or gift or is immovable. Specifically exempted are diplomatic and consular missions and the residence of the chiefs of such missions. This exemption applies to all of the situations encompassed by sections 1610(a) . . . [E]mbassies and related buildings could not be deemed to be property used for a "commercial" activity as required by section 1610(a).[10]

The explanation given by the House Report is consistent with the Tate Letter and the Vienna Convention.[11]

The county argues that the exemption from execution provided by § 1609 is not applicable because the apartment owned by the GDR is not used "for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission" as required by § 1610(a)(4)(B). On the contrary, asserts the county, the apartment is used for commercial activity as found by the district court in the 1978 judgment in the action brought by the county against the GDR.[12] Consequently, the county maintains that execution is also proper pursuant to § 1610(a)(2).

Regardless of the property's use in 1977 or 1978,[13] the record discloses that from

---

8. The restrictive principle of sovereign immunity was outlined in the "Tate Letter," 26 Department of State Bulletin 984, *also reported at* 6 M. Whiteman, Digest of International Law 569 (1968).

9. H.R.Rep.No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6605.

10. H.R.Rep.No. 1487, 94th Cong., 2d Sess. 29 *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6628.

11. *See* H.R.Rep.No. 1487, 94th Cong., 2d Sess. 20, *reprinted in* [1976] U.S.Code Cong. & Ad. News 6604, 6619.

12. Section 1603(d) of the Act states:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

13. We express no opinion about the use of the property during the period from its acquisition in 1976 to May 4, 1979. This is a fact that must be determined on remand.

May 4, 1979, the apartment exclusively housed the members of the diplomatic, administrative, technical, and service staff of the GDR Embassy and their families. The chief of the mission, however, did not reside there.

The question therefore arises whether the provision of § 1610(a)(4)(B) exempting from execution property "used for purposes of maintaining a diplomatic or consular mission" should be interpreted to include a building used exclusively for the housing of members of the mission and their families. The Department of State has taken the position that such a building is used for maintaining a diplomatic mission. This is implicit in the 1979 agreement which assured reciprocal exemption from taxation of property "used exclusively for purposes of their diplomatic missions, including residences for the staff of their diplomatic missions and members of their families forming part of their households."

In *Mexico v. Hoffman*, 324 U.S. 30, 35–56, 65 S.Ct. 530, 532–533, 89 L.Ed. 729 (1945), the Court pointed out that judicial seizure of the property of a friendly state may be regarded as an affront and affect our relations with it. The Court, therefore, admonished lower courts to accept the Department's determination of immunity. The doctrine of *Mexico v. Hoffman* appears to have been modified by the Foreign Sovereign Immunities Act, which was intended to codify State Department policies rather than have them presented by the Department on a case-by-case basis. Nevertheless, we believe this litigation presents an appropriate occasion for heeding the Court's admonition.

 Neither the Act nor its legislative history specifies what property is or is not "used for purposes of maintaining a diplomatic or consular mission." The views of the Department concerning the scope of this phrase, though not conclusive, are entitled to great weight. The Department is charged with maintaining our missions

abroad and with dealing with foreign missions here. It has expertise for determining whether property is used for maintaining a mission. Only if its views are manifestly unreasonable should they be rejected. In this instance we believe the Department's views are reasonable. The property is owned by a foreign state, and presently it is used exclusively by its diplomatic and consular staff and their families. It is not operated for profit as a commercial venture. On the contrary, it serves a public function.

Undoubtedly the purchase of this property was a commercial act regardless of its purpose. Consequently, the GDR would be subject to suit under § 1605(a)(2) by the vendor if a dispute arose over the terms of sale. Referring to diplomatic and consular property, the House Report states: "[A] foreign state cannot deny to the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters, as long as the foreign state's possession of the premises is not disturbed."[14]

We cannot accept the suggestion that the commercial acquisition of the property indelibly stamps the use of the property as a commercial activity. The House Report makes this clear by explaining the dichotomy between commercial activity and a public function:

> As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ulti-

14. *See* H.R.Rep.No. 1487, 94th Cong., 2d Sess. 20, *reprinted in* [1976] U.S.Code Cong. & Ad. News 6604, 6619.

mate object is to further a public function.[15]

We therefore conclude that § 1609 affords the GDR immunity for its apartment from execution of the tax lien and that none of the exceptions found in § 1610 are applicable.

## VI

The United States also assigns error to the district court's ruling that it is estopped from litigating the issue of the tax exempt status of the property prior to May 4, 1979. The district court concluded that its 1978 judgment in the action brought by Arlington County against the GDR collaterally estopped the United States from raising the issue. The court reasoned that the United States and the GDR were in privity even though they "may have different motivation for asserting the alleged immunity."

■ The doctrine of collateral estoppel "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Although the State Department was aware of the 1978 suit, the United States did not participate in it directly or indirectly. Consequently, to establish privity between the United States and the GDR, the county must prove that at least one of the following situations exists: "concurrent relationship to the same right of property . . . or representation of the interests of the same person." 1B Moore's Federal Practice ¶ 0.411[1] at 1255. The district court concluded that the first of these situations applied in this case. The county argues the second is also presented. We reject both these views.

The first situation described by Moore as "privity of estate" is generally reciprocal. Examples are the relationship between a trustee and the trust beneficiary or between guardian and ward. 1B Moore's Federal Practice at 1255–56. The second situation requires proof of a substantial identity of parties. 1B Moore's Federal Practice at 1255. *See Chicago, R. I. & P. Ry. v. Schendel*, 270 U.S. 611, 619–22, 46 S.Ct. 420, 423–24, 70 L.Ed. 757 (1926). Neither of these concepts describes the relationship between the United States and the GDR.

■ The United States had no privity of estate in the property of the GDR. It had no financial or proprietary interest in the apartment or in the assets of the GDR which would be depleted by payment of the taxes. Nor is there substantial identity of parties. Indeed, the interests of the United States and the GDR are quite distinct. The GDR sought to protect its sovereignty and pecuniary interests in the 1978 action. In contrast, the United States seeks to protect its own sovereignty, to preserve its foreign policy, and to meet its international obligations by asserting its rights under federal law. At most there exists between the United States and the GDR a contractual relationship created by the 1974 and 1979 agreements. But this relationship is insufficient to establish privity for the purposes of estoppel. *Cf. Chase National Bank v. Norwalk*, 291 U.S. 431, 438, 54 S.Ct. 475, 478, 78 L.Ed. 894 (1934).

There is a second reason why collateral estoppel is inappropriate. Collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *Commissioner v. Sunnen*, 333 U.S. 591, 599–60, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948); *see also Montana v. United States*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). Application of this principle provides an independent reason for holding that the United States is not estopped from litigating the tax status of the GDR's property prior to May 4, 1979.

---

**15.** H.R.Rep.No. 1487, 94th Cong., 2d Sess. 16, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6615.

After the district court decided that it had jurisdiction to adjudicate the county's suit against the GDR, the GDR stood on its plea of lack of jurisdiction and interposed no further defense. Quite understandably, the court did not address the issues the United States now raises. After hearing the county's witnesses, the court adopted the findings of fact and conclusions of law presented by the county, which dealt solely with the tax assessment, the amount of taxes that were claimed, and the county's entitlement to a tax lien under Virginia law. Based on evidence supporting these findings and conclusions, the court entered judgment for the county and declared that the property was subject to the lien.

Undoubtedly 28 U.S.C. § 1330(a) conferred jurisdiction on the district court to determine whether the GDR was immune under "sections 1605–1607 . . . or under any applicable international agreement." Although the court considered and rejected the GDR's claim for exemption under "treaty and international law," it made no findings and stated no conclusions about the claim of the United States that it had exempted the property through agreements cognizable under the supremacy clause. Furthermore, the district court could not have considered the claim of the United States that the 1979 agreement exempted the property from the time the GDR acquired it. Also, it did not consider whether the Treaty of Friendship, Commerce, and Consular Rights with Germany, December 8, 1923, 44 Stat. 2132, T.S. No. 725, exempted the property.

Immunity under § 1605 depended on the GDR's use of the property. The county contends that the GDR never proved that the building was used to house members of the diplomatic mission and their families. From our inspection of the record of the 1978 proceeding, we find no indication that the county proved that the building was used for any other purpose. Moreover, the court does not appear to have made a specific finding about the use of the property in 1977, the tax year in question.

The existence of these issues, which were not decided in the 1978 litigation, bars application of the doctrine of collateral estoppel against the United States. Our catalog of issues does not, of course, preclude the United States from raising other issues when it litigates the tax status of the property prior to May 4, 1979.

The judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

No. 81–1094—AFFIRMED.

No. 81–1125—REVERSED AND REMANDED.