## CITY OF ENGLEWOOD

v.

## SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Appellant.

### No. 84–5746.

United States Court of Appeals,
Third Circuit.

Argued June 19, 1985.

Decided Sept. 20, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 19, 1985.

McCarter & English, Newark, N.J., for appellant; William T. Reilly, Newark, N.J., of counsel; Keith E. Lynott, Newark, N.J., on brief; Curtis, Mallet-Prevost, Colt & Mosle, Joseph D. Pizzurro (argued), Robert W. Thabit, New York City, of counsel.

Rupp & Ten Hoeve, Hackensack, N.J., for appellee; John E. Ten Hoeve, Jr., Wil-liam F. Rupp (argued), Hackensack, N.J., on brief.

Before ALDISERT, Chief Judge, GIBBONS, Circuit Judge and BECHTLE, District Judge [*].

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

This case, removed from the New Jersey Tax Court pursuant to 28 U.S.C. § 1441(d) (1982), is before us on an appeal authorized by 28 U.S.C. § 1292(b) (1982) from the order of the district court denying the motion of Socialist People's Libyan Arab Jamahiriya (Libya) to dismiss for want of subject matter or personal jurisdiction.[1] The dispute giving rise to the New Jersey Tax Court litigation arises out of efforts of the City of Englewood, New Jersey, to tax a parcel of improved real estate purchased by Libya as a residence for its Head of Mission to the United Nations. Libya's application for exemption, based on its status as a foreign sovereign, was denied by Englewood. Proceedings in the tax court followed. After removal, Libya, relying *inter alia* on the Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2892, *codified at* 28 U.S.C. §§ 1330, 1332, 1341, 1441, 1602 *et seq.*, moved to dismiss. The district court denied that motion, but authorized a § 1292(b) appeal. We reverse.

### I.

On November 29, 1982, Libya purchased a large residence on 4.76 acres of land in Englewood, New Jersey. The following day it applied to Englewood for recognition of its tax exempt status. While that application was pending, Libya notified the United States' Mission to the United Nations that it had acquired the Englewood property as "a country residence for occasional use" by the Head of its United Nations Mission. On January 19, 1983, the

---

[*] Hon. Louis C. Bechtle, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The district court also ordered that the case be remanded to the tax court. That order was stayed pending appeal.

United States Mission notified all other United Nations missions that, pursuant to a determination by the Secretary of State, the Foreign Missions Act, 22 U.S.C. § 4301 *et seq.* (1982 & Supp. I 1983) was applicable to acquisitions of real property by all foreign missions. That Act authorizes the Secretary of State to require all missions to notify the Director of the State Department's Office of Foreign Missions before any acquisition or sale of real property by the mission. 22 U.S.C. § 4305 (1982). The January 19, 1983 letter was followed by an exchange of correspondence between Libya and the Office of Foreign Missions which, on June 10, 1983, culminated in the Secretary of State's imposing rather severe limitations on Libya's use of the premises. Further use limitations were imposed by the Secretary on December 22, 1983. Libya contests the validity of these limitations, but the parties before us agree that they prevent use of the property as anything but a "weekend retreat" by Libya's Head of Mission, his immediate family, and his guests.

Meanwhile, on January 4, 1983, Englewood denied Libya's application for recognition of tax exempt status. After several unsuccessful attempts to have the Englewood tax assessor reconsider his position, Libya sought to have the Bergen County Board of Taxation administratively overrule the Englewood assessor. The County agency sought guidance from the New Jersey Attorney General, who expressed the opinion that the property did not qualify for tax exemption under governing treaties because the residence was acquired only for "occasional use." In response to a letter to the Attorney General requesting "reconsideration," that office informed Libya that its opinion was only advisory, and that the matter should be pursued with the County Board of Taxation.

In August, Englewood petitioned the County Board to increase the assessment on the residence, and on August 15, 1983,

Libya filed an appeal to that Board contesting any assessment. On November 9, 1983, the County Board of Taxation affirmed the original assessment, denying Libya's appeal of the denial of tax-exempt status, and Englewood's petition to increase the assessment. Englewood then filed a complaint in the New Jersey Tax Court contesting the County Board of Taxation's refusal to increase the assessment. This complaint was mailed to Robert W. Thabit, Esq., an attorney who had been representing Libya in its efforts to have its tax-exempt status recognized. On January 13, 1984 Libya filed a removal petition.[2]

Libya moved to dismiss for lack of personal and subject matter jurisdiction, insufficiency of process and service, and failure to state a claim. While that motion was pending, counsel for Englewood obtained a letter from the Office of Foreign Missions setting forth the use restrictions which that office had placed on the property, and opining that there were no considerations of foreign policy suggesting the need for recognition of tax-exempt status. This letter was brought to the court's attention.

The district court denied Libya's motion to dismiss, rejecting Libya's contention that Englewood's failure to serve the tax court complaint in the manner specified in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608 (1982), deprived the tax court of personal jurisdiction. It also rejected Libya's contention that the Foreign Sovereign Immunities Act, and the Vienna Convention on Diplomatic Relations and Optional Protocols deprived the tax court and the district court of subject matter jurisdiction. The court reasoned that the New Jersey Tax Court could exercise jurisdiction over Libya under the Foreign Sovereign Immunities Act because 28 U.S.C. § 1605(a)(4) (1982) provides that a foreign state shall not be immune from suit in a case "in which rights in property in the United States acquired by succession or

2. Englewood moved for remand on the ground that the removal petition was untimely. The district court denied that motion.

gift or rights in immovable property situated in the United States are in issue...."

The Vienna Convention was held to be inapplicable because the Englewood premises were not "premises of the mission" within the meaning of the treaty article which shields such premises from taxation. 23 U.S.T. 3227, T.I.A.S. No. 7502, Art. 23, § 1. Recognizing, however, that New Jersey law makes no provision for in personam enforcement of liability for real estate taxation, the court turned to the more practical consideration of whether Englewood could execute against the property in an in rem foreclosure of the claimed lien of its tax assessment. Generally, property in the United States owned by a foreign state is immune from attachment and execution. 28 U.S.C. § 1609 (1982). The court interpreted 28 U.S.C. § 1610(a)(4)(B) (1982) to provide an exception from this immunity because the Englewood property was used for a "commercial activity" and was not used as "the residence of the Chief of such Mission...."

## II.

Historically, foreign nations enjoyed absolute immunity from both suit and execution. *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). In 1952, in the "Tate Letter," 26 Dept.Stat.Bull. 984 (1952), the State Department adopted a restrictive theory of foreign sovereign immunity under which "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (*juri gestionis*)." *Id.* Both before and after the adoption by the State Department of the restrictive theory of sovereign immunity, the State Department played a critical role in the determination of immune status. Acting in a quasi-judicial capacity, the State Department would, if it decided that a claim of sovereign immunity should be recognized, request the Attorney General to file a suggestion of immunity in the court in which the action was pending. These suggestions were binding on the courts. *Republic of*

*Mexico v. Hoffman,* 324 U.S. 30, 34–35, 65 S.Ct. 530, 532–33, 89 L.Ed. 729 (1945).

In 1976, Congress codified the law of foreign sovereign immunity with the enactment of the Foreign Sovereign Immunities Act. The statute adopted the restrictive theory of sovereign immunity embodied in the Tate Letter. It also transferred the responsibility for making the determination of immunity from the State Department to the courts. As the House Report on the law explains:

A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity.

H.R.Rep. 1487, 94th Cong., 2d Sess. 7 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6606. The Act also was intended to "provide a statutory procedure for making service upon, and obtaining in personam jurisdiction over, a foreign state." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 8 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6606. The service provisions are directed at eliminating the former practice of attempting to seize the property of foreign states in an effort to compel their appearance. Moreover the Act brings the law of execution more closely in line with the restrictive theory of sovereign immunity, by permitting execution upon commercial assets. The House Report notes:

Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation where commercial assets are available for the satisfaction of a judgment. [The Act] seeks to restrict this

broad immunity from execution. It would conform the execution immunity rules more closely to the jurisdiction immunity rules. It would provide the judgment creditor some remedy if, after a reasonable period, a foreign state or its enterprise failed to satisfy a final judgment.

*Id.* Finally, the Act is totally preemptive. 28 U.S.C. § 1602 (1982). As the House Report states, the Act

> sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States. It is intended to preempt any other State or Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns, their political subdivisions, their agencies, and their instrumentalities.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6610. The Supreme Court and this court have so held. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Rex v. Compania Pervana de Vapores, S.A.,* 660 F.2d 61 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982).

The basic rule in the Act is that

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604 (1982). Thus, unless a statutory exception applies, no court may exercise personal jurisdiction over a foreign state. Moreover with respect to execution on the property of foreign states the Act contains a parallel provision:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of

a foreign state shall be immune from attachment, arrest, and execution except as provided in sections 1610 and 1611 of this chapter.

28 U.S.C. § 1609 (1982). The Act contains substantially parallel exceptions to the general rule of immunity from personal jurisdiction and immunity from execution. Among the exceptions to immunity from personal jurisdiction, the only ones even arguably relevant are:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> . . . . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States ...
>
> . . . . .
>
> (4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue....

28 U.S.C. § 1605(a)(2) and (4) (1981). The arguably relevant exemptions to the section 1609 immunity from execution provide:

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State ... if—
>
> . . . . .
>
> (2) the property is or was used for the commercial activity upon which the claim is based, or
>
> . . . . .
>
> (4) the execution relates to a judgment establishing rights in property—
>
> . . . . .
>
> (B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular

mission or the residence of the Chief of such mission....

28 U.S.C. § 1610(a)(2) and (4) (1982).

The exceptions to the immunity from execution are not precisely equivalent to the exceptions to immunity from adjudication. The latter permits adjudication of actions based upon commercial activity in the United States and of disputes over title to property without regard to commercial activity. Section 1610(a), however, permits execution on property of a foreign state only if it is used for commercial activity in the United States, and then only in the instances listed in that subsection. The term commercial activity, common to both the jurisdictional and the execution exceptions, is defined as:

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d) (1982).

Under this statutory scheme, the New Jersey Tax Court is barred by section 1604 from exercising jurisdiction over Libya, and the City of Englewood is prohibited by section 1609 from foreclosing any claimed tax lien by execution. The exceptions to sections 1604 and 1609 relied upon by the district court are inapplicable.

Turning first to the title dispute exception in section 1605(a)(4), we note that the House Report states:

> Actions short of attachment or execution seem to be permitted under the [Vienna] Convention, and a foreign state cannot deny to the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters, as long as the foreign state's possession of the premises is not disturbed.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 20, *reprinted in* 1976 U.S.Code Cong. & Ad. News 6604, 6619. The House Report and the plain language of section 1605(a)(4) suggest that this exception deals with the recognized principle of international law that a sovereign may resolve disputes over title to real estate within its geographic limits. Thus this section, "like the traditional real property exception it was intended to codify, is limited to disputes directly implicating property interests or rights to possession...." *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1522 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985). No one disputes Libya's title to the Englewood premises or its right to exclude others from possession thereof. Thus section 1605(a)(4) does not apply.

 The case for an exception, either to section 1604 or to section 1609 turns, therefore, on whether, by acquiring and holding title to the Englewood premises, Libya was engaging in a "commercial activity." The district court reasoned that the commercial activity exception applied because the property was acquired by Libya in a commercial transaction between a seller and a buyer. That reasoning is directly in conflict with the decision of the Court of Appeals for the Fourth Circuit in *United States v. County of Arlington,* 669 F.2d 925 (4th Cir.), *cert. denied,* 459 U.S. 801, 103 S.Ct. 23, 74 L.Ed.2d 39 (1982). In the *Arlington* case the court held that acquisition of property was commercial activity for purposes of section 1604 only if the dispute centered around the acquisition of the property. *Id.* at 934. A separate inquiry into whether the property is used in "a regular course of commercial conduct" is required when, as here, the dispute does not arise from the acquisition of the property.

 The interpretation of the *Arlington* court is consistent with the disjunctive definition of commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d) (1982). If acquisition of property in a particular commercial transaction or act indelibly stamped the property as used for commercial activity, even foreign embassies and chancelleries would be subject to execution. Plainly Congress did not intend a result so incon-

sistent with recognized principles of international law. Thus we reject the district court's reasoning that the commercial nature of the acquisition of the Englewood premises determines its liability to execution for unpaid real estate taxes. The determinative issue is whether it is currently being used in a "regular course of commercial conduct."

■ The only purpose Libya has in holding the property, so far as this record discloses, is for use by the Chief of its Mission to the United Nations. That is activity directly related to the purposes of the mission, and as a matter of law such use is not commercial activity. The record discloses no activity conducted for profit at the Englewood residence; there is no evidence to suggest that it is used in "a regular course of commercial conduct...."

Because the Englewood residence is not used for a commercial activity, and because the dispute does not center on the acquisition of the property, neither the section 1605 exception to immunity from personal jurisdiction, nor the section 1610 exception to immunity from execution apply. Hence, we need not determine the applicability of the proviso to section 1610(a)(4)(B) protecting from execution "the residence of the Chief of [a] mission." The district court held that this proviso protected only the "principal" residence of the Chief, and emphasized that the restrictions imposed by the Office of Foreign Missions forbade such use by the Chief. The proviso at issue limits the exception in section 1610(a)(4) which allows execution on property "used for a commercial activity" when "the execution relates to a judgment establishing rights in property ... which is immovable and situated in the United States...." 28 U.S.C. § 1610(a)(4)(B) (1982). This exception pertains to disputes over "a particular commercial transaction," 28 U.S.C. § 1603(d) (1982), involving immovable property. As noted above, this is not a dispute over title to the premises, so section 1610(a)(4)(B) does not apply. Thus we need not determine whether the district court correctly held that the proviso is limited to the "principal" residence of the Chief of Mission.

### III.

Since none of the exceptions to sections 1604 and 1609 apply, the district court erred in denying Libya's motion to dismiss the complaint for lack of subject matter jurisdiction. This conclusion means that the lawsuit must terminate. Libya also contends that it was not served in the manner specified in section 1608. Defects in the method of service could, of course, be cured, and thus a resolution of the dispute over method of service might be useful if the case could otherwise go forward. Since, however, it is barred by the general prohibitions in sections 1604 and 1609, no useful purpose would be served by deciding whether, as the district court held, the receipt of actual notice of the suit cures any defect in method of service. The order appealed from will be reversed and the case remanded with a direction to grant Libya's motion to dismiss for lack of subject matter jurisdiction.