THE CITY OF NEW YORK, Plaintiff,

v.

THE PERMANENT MISSION OF IN-DIA TO THE UNITED NATIONS, Greatamerica Leasing Corporation, and "Jane Doe # 1" through "Jane Doe # 20", the names of the last 20 defendants being unknown to plaintiff, the person or parties intended to be, persons or corporations, if any, having or claiming an interest in or lien upon the property described in the complaint, Defendants.

The City of New York, Plaintiff,

v.

The Bayaryn Jargalsaikhan, as Principal Resident Representative to the United Nations of the Mongolian People's Republic, and "Jane Doe # 1" through "Jane Doe # 20", the names of the last 20 defendants being un-

known to plaintiff, the person or parties intended to be, persons or corporations, if any, having or claiming an interest in or lien upon the property described in the complaint, Defendants.

Nos. 03 CIV. 3256(RCC), 03 CIV. 6086(RCC).

United States District Court, S.D. New York.

July 7, 2005.

Michael A. Cardozo, New York City, for Plaintiff.

John J.P. Howley, Robert A. Kandel, Robert Negron Jr., Kaye Scholer, LLP, New York City, for Defendants.

## MEMORANDUM & ORDER

CASEY, District Judge.

In these actions the City of New York ("City") seeks declaratory judgments that it has valid tax liens against two properties in Manhattan—one owned by the Permanent Mission of India to the United Nations ("India") and the other by the Bayaryn Jargalsaikhan as the Principal Resident Representative of the Mongolian People's Republic to the United Nations ("Mongolia")—as a result of unpaid real-property taxes, other charges, and interest. India and Mongolia ("Defendants") have moved to dismiss the complaints against them on the ground that they are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. On what appears to be a matter of first impression in this Circuit, the Court concludes that India and Mongolia are not immune from suit because rights in immovable property situated in the United States are in issue. Accordingly, Defendants' motions are **DENIED**.

## I. BACKGROUND

India and Mongolia use their respective properties as office and residential space related to their Missions to the United Nations. Since 1993, India has used the first six floors, basement, and cellar of its property for Mission offices and accessory space. (Ruchira Kamboj Aff. ¶ 3.[1]) Floors seven through twenty-six contain residential apartments, in which Mission diplomats and their families reside. (*Id.* ¶¶ 3–4.) Security personnel and a driver are housed on the seventh floor. (*Id.* ¶ 5.) No resident of the building pays rent or other

---

1. Although a court is ordinarily confined to the pleadings in deciding a motion to dismiss, it may consult affidavits when the motion is directed to the court's subject matter jurisdiction. *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir.2004).

costs of housing. (*Id.* ¶ 7.) Mongolia has used its premises for Mission office and residential space since 1980. (*See* Gansukh Purevjav Aff. ¶ 3.) The six-story building provides offices and housing for the Ambassador–Permanent Representative to the United Nations, four other diplomats, and an administrative officer and driver. (*Id.* ¶ 2.)

The City contends that Defendants must pay real-property taxes on those portions of the buildings that are used neither as Mission office space nor as an official residence for the countries' resident representatives to the United Nations with rank of ambassador or minister plenipotentiary. The City alleges that floors seven through twenty-six of India's premises are taxable because they are used exclusively as residences for staff below the rank of ambassador. India allegedly owes $16,376,702.09 in unpaid real-estate taxes, other charges, and interest accrued as of January 31, 2003. Mongolia allegedly has failed to pay $2,068,995.00 in real-estate taxes and interest accrued as of January 31, 2003. The sums sought stem from Mongolia's use of the fourth and fifth floors of its premises as residential space for staff ranking below the Mongolian Ambassador to the United Nations.

New York law requires the payment of real-estate taxes on portions of foreign-government property that is not "used exclusively for the purposes of maintaining offices or quarters, for [the principal resi-

dent representative or resident representative with the rank of ambassador or minister plenipotentiary], or offices for the staff of such representatives." N.Y.Real Prop. Tax Law § 418(1). New York law further provides, "If a portion only of any lot or building of any such [foreign] government or [principal resident] representative is used exclusively for the purposes herein described, then such portion only shall be exempt and the remainder shall be subject to taxation unless otherwise exempt from taxation by law."[2] *Id.*

The City originally brought suit in New York State Supreme Court to enforce payment of the unpaid taxes assessed against those portions of the buildings alleged not to be exempt from taxation under the New York Real Property Tax Law. Defendants removed the cases to this Court pursuant to 28 U.S.C. § 1441(d), which provides for removal by a foreign state of any suit brought against it in state court. After jurisdictional discovery, Defendants moved to dismiss the suits against them for lack of subject matter jurisdiction. The Court received consolidated briefing and argument on the motions, which address the identical issue: whether this Court has jurisdiction under the FSIA to eventually adjudicate the validity of the tax liens.

## II. DISCUSSION

 The FSIA provides the sole basis for a court in the United States to exercise subject matter jurisdiction in a suit against a foreign state.[3] *Argentine Republic v.*

**2.** The parties debate the application of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, TIAS 7502, to the issue of immunity from taxation. The parties agree, however, that the Court cannot reach that issue unless it has subject matter jurisdiction, and that the question of subject matter jurisdiction must be answered with reference to the FSIA and not the Vienna Convention. The defendants have not challenged the complaints on the merits, and the Court therefore cannot decide on these mo-

tions whether resolution of the merits will turn on application of the Vienna Convention, either as a matter of federal law trumping the state provisions cited herein or as a matter of New York law under the clause, "unless otherwise exempt from taxation by law," N.Y. Real Prop. Tax Law § 418(1).

**3.** Although the FSIA states, *"[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act* a foreign state shall be im-

*Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Under the FSIA, a foreign state is presumed to be immune from suit. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The party seeking to sue a sovereign bears the burden of overcoming this presumption by showing that a specific immunity exception applies. *See Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir.2002). The City asserts that the FSIA exception to immunity from suit in any case "in which rights ... in immovable property situated in the United States are in issue," 28 U.S.C. § 1605(a)(4), removes immunity here.[4]

## A. Defendants Are Not Entitled To Immunity Under the FSIA

The Court must begin its task of statutory interpretation with Congress's chosen language. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("As in all statutory construction cases, we begin with the language of the statute."). As just mentioned, the FSIA provides that a foreign nation will be required to litigate suits implicating "rights in immovable property." But, as then-Judge Scalia has explained, the FSIA's use of this phrase is not very enlightening: "[T]he term 'rights in immovable property' is an imprecise one, susceptible of as many different meanings as there are areas of law for which that characterization of an interest may be relevant." *Asociacion de Reclamantes v. United Mexican States,* 735

F.2d 1517, 1521 (D.C.Cir.1984). Faced with this ambiguity, to determine what Congress intended to include within the immovable-property exception the Court must look to extraneous sources—international practice at the time the FSIA was enacted and the exception's legislative history. *See id.* (examining legislative history and the FSIA's purposes to determine what Congress meant by the language used in the immovable-property exception).

### 1. *International Practice When The FSIA Was Enacted*

■ Prior to 1952, federal courts in the United States, following the position of the State Department, generally granted foreign sovereigns complete immunity from suit. *Verlinden B.V. v. Cent. Bank of Nig.,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In 1952, the State Department's policy changed, as reflected in a letter that Acting Legal Advisor Jack B. Tate sent to the U.S. Attorney General ("Tate Letter"). *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion) (reprinting the Tate Letter). The Tate Letter signified a shift from the absolute to a more restrictive theory of foreign sovereign immunity. *Verlinden B.V.,* 461 U.S. at 487, 103 S.Ct. 1962. "Under the restrictive, as opposed to the 'absolute,' theory ..., a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure*

---

mune from the jurisdiction of the courts of the United States and of the States" unless an exception applies, 28 U.S.C. § 1604 (emphasis added), the parties agree that the issue of jurisdictional immunity is controlled by the FSIA and not any preexisting international agreement.

4. The City also asserts that the FSIA exception to immunity for any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state," 28 U.S.C. § 1605(a)(2), applies. Because the Court concludes that it has jurisdiction under the FSIA's "immovable-property" exception, it need not decide whether the "commercial-activities" exception applies.

*gestionis* )." *Nelson,* 507 U.S. at 359–60, 113 S.Ct. 1471. Despite these competing views, the Tate Letter explained that, "[t]here is agreement by proponents of both theories, supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps consular property excepted)." Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 711, 96 S.Ct. 1854.

The restrictive theory of foreign sovereign immunity, set forth in the Tate Letter, was ultimately codified by the FSIA. *See* H.R. No. 94–1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605 ("[T]he bill would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law."); *see also Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 612–13, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (holding that the FSIA largely codifies the restrictive theory and that its terms must be read against the backdrop of international practice at the time the FSIA was enacted). The FSIA also adopted the Tate Letter's view that a sovereign may be sued with respect to real property. *Asociacion de Reclamantes,* 735 F.2d at 1521 (explaining that "[t]he immovable property exception was enacted to codify, with minor modifications . . ., the pre-existing real property exception to sovereign immunity recognized by international practice"). Accordingly, the House of Representatives Report on the FSIA notes that the immovable-property exception "denies immunity in litigation relating to rights in real estate . . . located in the United States. It is established that, as set forth in the 'Tate Letter' of 1952, sovereign immunity should not be granted in actions with respect to real property, diplomatic and consular property excepted." H.R.Rep. No. 94–1487, at 20, 1976 U.S.C.C.A.N. at 6618–19.

The immovable-property exception was thus included in the FSIA in an effort to codify what the Tate Letter generally referred to as settled international practice under the restrictive, and even the absolute, theories of foreign sovereign immunity. But the FSIA itself sheds little light on what in 1976 was the settled international practice as to whether or when a sovereign could be sued in a real-property dispute. In addition, the FSIA does not discuss what the Tate Letter meant when it referred to "diplomatic and . . . consular property" as being excepted from immunity. *See* Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 711, 96 S.Ct. 1854. The answers to these matters serve as guideposts to whether Defendants may be subject to suit here.

International practice at the time of the FSIA's enactment "declined to extend the immunity of a foreign sovereign to 'an action to obtain possession of or establish a property interest in immovable property located in the territory of the state exercising jurisdiction.'" *Asociacion de Reclamantes,* 735 F.2d at 1521 (quoting Restatement (Second) of Foreign Relations Law of the United States § 68(b) (1965)). According to the Second Restatement, "[t]he immunity from jurisdiction of a foreign state [did] not extend to actions for the determination of possession of, or an interest in, immovable or real property located in the territory of a state exercising jurisdiction." Restatement (Second) of Foreign Relations Law of the United States § 68 cmt. d.[5]

---

5. The commentary to the Second Restatement also provides that the immovable property exception "does not preclude immunity with respect to a claim arising out of a foreign state's ownership or possession of immovable property but not contesting such ownership or the right to possession." Restatement (Second) of Foreign Relations Law of the United States § 68 cmt. d. But, as the court in *Asociacion de Reclamantes* explained, this provision merely clarifies that "a foreign sov-

International practice at the time of the FSIA's enactment also reflected acceptance of the principle that "courts are simply not well equipped to decide property interests or rights to possession with regard to land outside their jurisdiction, particularly land located in a foreign nation." *Asociacion de Reclamantes*, 735 F.2d at 1521. This maxim effectively extended to international practice what is understood in domestic property jurisprudence to be the "local-action rule." *See id.* at 1522.[6] That this maxim has been incorporated into international practice is evident in a report of the International Law Commission ("ILC"). In 1977, the United Nations General Assembly gave to the ILC the task of examining and reporting on the international practice of sovereign jurisdictional immunity. *See* Stephen C. McCaffrey, *The Thirty–Fourth Session of the International Law Commission*, 77 Am. J. Int'l L. 323, 328 (1983). During the course of its work, and just a few years after Congress passed the FSIA, the ILC referenced the local-action rule as a reason to remove jurisdictional immunity when real property was at issue. The ILC report thus explained:

> As far as property is concerned, especially immovable property, the State of the *situs* exercises supreme authority as part and parcel of its sovereignty. Indeed, the concept of ownership and other proprietary rights or interests can only exist within the framework of the legal system of the *situs*, and such a concept is bound to be inherently absorbed within the notion of territorial sovereignty of the State of the *situs* itself . . . .

The applicable law is unmistakably the *lex situs* as no other law can be more proper than the law of the place where the property is situated. *A fortiori* the régime or legal relationship with regard to land or immovable property, with its peculiar history, niceties and complexities, has developed in response to the needs of the territorial society, its traditions, usages and customs. Every system of land law or law concerning immovable property is unique in itself. Its exclusive applicability cannot be disputed, since ownership and other proprietary rights or interests in property do not and cannot exist except within the framework and purview of the *lex situs*. The supremacy of the *lex situs* and its sole authority in regard to property have rendered the assumption and exercise of territorial jurisdiction by the *forum rei sitae* all the more inevitable; in the absence of any alternative or competitive system of law, neither the *lex patriae* nor the *lex fori* of an extraterritorial authority could qualify to replace or supplant either the jurisdiction of the *forum rei sitae* or the exclusive applicability of the *lex situs*.

International Law Commission, *Documents of the Thirty–Fifth Session*, [1983] II Y.B. Int'l L. Comm'n 46–47, U.N. Doc. A/CN.4/SER.A/1983/Add.1(Part 1).

When the FSIA was enacted, international law recognized that real property was à matter of unique local import, such that local courts were best equipped to decide all issues pertaining to it. Against this backdrop, a sovereign necessarily acknowledges the supremacy and jurisdiction of local courts when it purchases property,

---

ereign was not immune in an eminent domain proceeding involving its property, but was immune in a negligence suit for injury suffered by a private individual while on its property." 735 F.2d at 1521.

**6.** As the court in *Asociacion de Reclamantes* stated, the local-action rule "makes the locality's power exclusive and deprives other courts of jurisdiction to settle questions involving real estate." 735 F.2d at 1521–22.

which it will own, use, and possess within the framework of that local law. These general principles have equal force to the dispositive issue here: whether a federal district court may adjudicate the validity of a municipality's tax liens levied against a foreign sovereign's real property. A tax lien is a mechanism created by local law to ensure that landowners pay real-estate taxes. The meaning of such a lien is understood only by resort to the local law from which it originates. Principles of international law thus contemplate that courts sitting in the locality that created the tax lien possess the sole authority to adjudicate issues related to the lien. Hence, international practice at the time of the FSIA's enactment would not provide immunity from the claims asserted here.

Contrary to Defendants' assertion, referring to local law to define the contours of the FSIA's immovable-property exception is not incompatible with Congress's intention of achieving uniformity in the area of foreign sovereign immunity. It is true that the FSIA was intended to create a uniform regime of foreign sovereign immunity. *See* H.R. Rep. 94–1487, at 13, 1976 U.S.C.C.A.N. at 6611 ("[J]urisdiction in the Federal courts should be conducive to uniformity in decision, which is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences."). But the FSIA codifies the exception for real-property suits as it existed under international practice, and that practice responds to the historical reality that "[e]very system of land law or law concerning immovable property is unique in itself." International Law Commission, *Documents of the Thirty–Fifth Session, supra,* at 47. Foreign governments own, use, and possess land subject to the unique regulations of the forum jurisdiction; their property rights derive from, and are protected by, that regime. Because Defendants purchased the land subject to New York's

property law, including real-estate taxes and liens to enforce them, they are subject to the resolution of suits arising under that law in New York courts. The FSIA's goal of uniformity is not undermined by, but rather recognizes, that the substance of the applicable property law will necessarily depend on the jurisdiction in which the property is located. That is the very rationale for the local-action rule and the corresponding international practice that the FSIA adopts.

### 2. The FSIA's Legislative History

The legislative history behind the immovable-property exception also suggests that Congress believed matters such as tax liens would lay within that exception. As the court in *Asociacion de Reclamantes* explained, the examples in the House Report that fall within the exception—"questions of ownership, rent, servitudes, and similar matters," H.R. Rep. 94–1487, at 20, 1976 U.S.S.C.A.N. at 6619—are consistent with the international practice that limited the exception to "disputes directly implicating property interests or rights to possession," *Asociacion de Reclamantes,* 735 F.2d at 1522. Congress intended that matters similar to ownership, rent, and servitudes were to be justiciable; a lien is just such a "similar" matter. The common legal meaning of "servitude" at the time Congress enacted the FSIA was "[a] charge or burden resting upon one estate for the benefit or advantage of another." Black's Law Dictionary 1535 (4th ed.1968). A servitude is therefore a type of encumbrance on property. *See id.* at 908 (defining "incumberance" as "[a]ny right to, or interest in, land which may subsist in another to the diminution of its value, but consistent with the passing of the fee"). At the time the FSIA was enacted, a lien was generally understood to be a "charge or security or incumbrance upon property." *Id.* at 1072. It also has a similar

meaning in New York. *See* N.Y. Real Prop. Tax Law § 102(21) (" 'Tax lien' means an unpaid tax, special ad valorem levy, special assessment or other charge imposed upon real property by or on behalf of a municipal corporation or special district which is an encumbrance on real property, whether or not evidenced by a written instrument."). Like a servitude, a lien on real property "runs" with the land. *See* Restatement of Prop. § 540 (1944) ("[A] lien is enforceable against the successors in title or possession of the promisor to the extent it was enforceable against him . . . ."). Both servitudes and liens, therefore, burden the land; in so doing, they directly affect the property owner's rights to alienate or convey the property. *See Republic of Argentina v. City of New York*, 25 N.Y.2d 252, 303 N.Y.S.2d 644, 250 N.E.2d 698, 702 (1969).

In *Republic of Argentina v. City of New York*, the New York Court of Appeals held, as a matter of customary international law, that a foreign state's consular property was immune from real-property taxes. *Id.* at 704. The City had argued that it could obtain a tax lien against the property without offending the foreign sovereign's ownership. *See id.* at 702. The court responded that a lien would also offend the principles of sovereign immunity because "a lien has an immediate adverse effect upon the amount which the [foreign] government would receive on a sale, to sanction its imposition would constitute *a direct interference with the property of a foreign state* . . . ." *Id.* (emphasis added). The court's holding on the merits—that the City was barred from taxing consular property—is not relevant to the instant motion. But the Court of Appeals' observation that, as a matter of New York law, a lien is a direct interference with property rights, strongly favors the City's argument that a suit to adjudicate the validity of a lien puts rights in immovable property in issue. And in a more recent case, the

Court of Appeals reiterated its view that tax liens "substantially affect the rights of property owners." *Zaccaro ex rel. Estate of Zaccaro v. Cahill*, 100 N.Y.2d 884, 768 N.Y.S.2d 730, 800 N.E.2d 1096, 1100 (2003).

The rationale behind these holdings is apparent. Part of an owner's rights in real property is the right to alienate or sell the property. The presence of a tax lien means that the owner does not have the power to convey full rights and title to another purchaser, but that any subsequent purchaser would take the property subject to the lien. Thus, a tax lien directly affects a property owner's rights in the property. And a suit adjudicating the validity of such a lien therefore puts in issue the owner's rights in that property. The claimed tax liens directly implicate Defendants' rights in their real property.

### 3. *Defendants' Specific Arguments Lack Merit*

■ Defendants maintain that the immovable-property exception does not apply because the tax liens would not deprive them of ownership or possession of the Mission premises. To support this proposition, they rely on *Rodriguez v. Republic of Costa Rica*, 297 F.3d 1 (1st Cir.2002); *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31 (3d Cir.1985); and *Fickling v. Commonwealth of Australia*, 775 F.Supp. 66 (E.D.N.Y. 1991). These cases do not persuade the Court that the exception is as limited as Defendants would have it.

In *Rodriguez*, the plaintiffs sued the Republic of Costa Rica for unpaid rent; the Consul and Vice–Counsel who had been living on the premises had vacated by the time the case reached court and did not seek reinstatement. *See* 297 F.3d at 4–5, 11. The First Circuit held that "purely compensatory rights, without more, are in-

sufficient to sustain jurisdiction under the immovable property exception." *Id.* at 11. That is so, the court held, because the rationale behind the exception is that foreign courts are not equipped to decide property disputes making it "important for property disputes to be adjudicated by local courts." *Id.* at 12 (citing *Asociacion de Reclamantes,* 735 F.2d at 1521). The plaintiffs argued that the House Report referred to actions for rent as among those that came within the exception under international law. The First Circuit rejected this argument, noting that the inclusion of actions for rent most likely referred to such actions that also involve issues of title and possession. *Id.* at 12–13.

The court also rejected the plaintiffs' contention that the Third Restatement of Foreign Relations Law supported their position. *See id.* at 13. The Third Restatement provides that under the immovable-property exception, as a matter of international practice, "controversies concerning payment of rent, taxes and other fees concerning [premises used for an embassy, consulate, or diplomatic mission] are subject to adjudication in local courts." Restatement (Third) of Foreign Relations Law § 455 cmt. b (1987). The First Circuit reiterated its conclusion that only suits implicating both rent and ownership or possession fall within the exception. *Rodriguez,* 297 F.3d at 13. The court determined that the Restatement referred to "rent, taxes and other fees" sought "in the process of adjudicating 'rights of ownership, possession, occupation or use.'" *Id.* (quoting Restatement (Third) of Foreign Relations Law § 455 cmt. b).

Defendants rely on *Rodriguez* to argue that only those suits that would deprive a foreign sovereign of ownership or possession of immovable property fall within the immovable-property exception. The First Circuit's holding, however, was not so broad. The court merely held that "the immovable property exception applies only in cases in which rights of ownership, use, or possession are at issue." *Rodriguez,* 297 F.3d at 13. *Rodriguez* was not among such cases because the plaintiffs were seeking money damages, essentially for breach of contract. Indeed, the court noted that a suit for nonpayment of rent "is, first and foremost, a contract dispute." *Id.* The court in *Rodriguez* therefore held nothing more than that contract disputes do not involve rights in immovable property simply because the alleged breach occurred during the use or possession of real estate. The result of a successful breach-of-contract suit would be the payment of money; a successful result in these actions, in contrast, would give the City a property right in the Mission premises that would "substantially affect the rights of [Defendants as] property owners." *Zaccaro,* 768 N.Y.S.2d 730, 800 N.E.2d at 1100. Accordingly, *Rodriguez* does not command the result that Defendants desire.

Nor does *City of Englewood.* The court there held that the immovable-property exception did not apply to a suit by a municipality challenging a local tax board's decision to deny a tax increase on property owned by Libya, which argued that it could not be taxed at all. *See* 773 F.2d at 33. The Third Circuit only briefly discussed the immovable-property exception, simply noting the proposition that the exception " 'is limited to disputes directly implicating property interests or rights to possession.'" *Id.* at 36 (quoting *Asociacion de Reclamantes,* 735 F.2d at 1522). The Third Circuit then concluded: "No one disputes Libya's title to the Englewood premises or its right to exclude others from possession thereof. Thus section 1605(a)(4) does not apply." *Id.* The court, however, did not explain why the suit to force the payment of real-property taxes did not directly implicate Libya's property

interests even though the payment of such taxes was a condition of owning real estate in Englewood and arose only because of such ownership. In light of the treatment of the immovable-property exception in *City of Englewood,* that case does not offer Defendants adequate support to overcome the authority bolstering the City's position.

And *Fickling* is inapposite here. In *Fickling,* an Australia court issued a "caveat" during divorce proceedings, which precluded the plaintiffs from selling, transferring, and encumbering certain property. *See* 775 F.Supp. at 68. The plaintiffs sought to stretch the immovable-property exception to reach real estate located in the United States that the plaintiffs had used as collateral to secure a loan from a foreign bank, and which the caveat prevented from being sold or encumbered pending the outcome of the divorce proceedings. *See id.* at 72. The plaintiff sued Australia, alleging jurisdiction to be founded on, among other things, Australia's expropriation of the plaintiffs' property rights.

The court held that the exception did not apply because Australia had not claimed to own or control the property. *Id.* The caveat was not a right in the U.S. property, but merely a procedural device to preserve the integrity of the Australian divorce court's jurisdiction over the marital dispute. The caveat was a product of Australian law, not New York property law as in the case of a lien. Unlike in cases concerning tax liens, the courts of New York have no special competence to adjudicate the propriety of a device originating in Australian law. The *Fickling* suit was an attempt to undo an Australian court order and was best addressed to the Australian court that issued it. Therefore, the rationale for the internationally recognized real-property exception that the FSIA codifies had no application in *Fickling.*

Finally, Defendants contend that the City's position would mean that any dispute could put rights in immovable property in issue, if, by action of state or local law, a litigant could place a lien on real estate. For example, the argument goes, if local law permitted a real-property lien to enforce a tort judgment, then the limitations in the FSIA on jurisdiction over tort suits could be eviscerated. *See* 28 U.S.C. § 1605(a)(5) (providing limited exception to sovereign immunity from tort suits). Or, in the example that the defendants cite, a plaintiff could use the immovable-property exception to "bootstrap" a claim that would not meet the commercial-activities exception's requirements merely by seeking a lien on real property. While those specters may be raised legitimately elsewhere, they inspire no fear here. The claimed liens arise directly out of Defendants' ownership and use of real estate in the United States. The taxes that the City alleges it is owed are imposed due to ownership and use of the property, not indirectly as a result of some unrelated act such as a tort or breach of contract. Thus, the validity of the property liens "directly implicate[s] interests in the property" because the liens require adjudication of whether Defendants may own and possess the property free of local real-estate taxes. *See Asociacion de Reclamantes,* 735 F.2d at 1522.

## B. The Tate Letter's Exception For Diplomatic Property Is Inapplicable

■ The exception for diplomatic and consular property to which the Tate Letter refers also does not require immunity in these cases. The House Report addressed the exception in the Tate Letter and noted:

It is maintainable that the exception mentioned in the 'Tate Letter' with respect to diplomatic and consular property is limited to questions of attachment

and execution and does not apply to an adjudication of rights in that property. Thus, the Vienna Convention on Diplomatic Relations ... 23 UST 3227, TIAS 7502 (1972), provides in article 22 that the 'premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment, or execution.' Actions short of attachment or execution seem to be permitted under the Convention, and a foreign state cannot deny the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters, as long as the foreign state's possession of the premises is not disturbed.

H.R.Rep. No. 94–1487, at 20, 1976 U.S.C.C.A.N. at 6619. According to the House Report, although suits that would disturb a foreign sovereign's ownership and possession of diplomatic premises might be barred, suits such as these that merely concern encumbrances like servitudes would not. Defendants, then, have it exactly backwards: where diplomatic property is concerned, the exception is not limited to suits that would deprive the foreign sovereign of ownership or possession.

If Defendants were correct that Congress only intended suits disturbing a sovereign's ownership or possession of immovable property to fall within the exception, then the observation in the House Report would make no sense. The legislative history suggests that Congress, consistent with its view of international law, intended to permit suits in which rights in diplomatic property were in issue as long as the suits did *not* seek to oust a foreign sovereign from ownership or possession of the property.

## III. CONCLUSION

The international practice that the immovable-property exception codifies and the legislative history of the FSIA demonstrate that Defendants are not entitled to immunity from these claims because the tax liens place their and the City's rights in the Mission properties in issue. Accordingly, the Court may exercise jurisdiction under the FSIA to adjudicate the validity of those liens. It is worth emphasizing that this conclusion is not meant to have any impact on the separate question of whether the properties are immune from taxation. The premises may or may not be exempt from taxation; the Court merely holds today that it is empowered to make that determination. Defendants' motions to dismiss for lack of subject matter jurisdiction are therefore **DENIED**.

So Ordered: