BERGMAN v. DE SIEYES.
No. 41, Docket 21057.

United States Court of Appeals
Second Circuit.

Nov. 4, 1948.

Katz & Sommerich, Henry I. Fillman, and Benjamin Busch, all of New York City, for appellant.

Donovan, Leisure, Newton, Lumbard & Irvine, and Theodore S. Hope, Jr., all of New York City, for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

■ This cause originated in the state court and was removed by the defendant

for diversity of citizenship. The complaint was upon a cause of action for deceit, and the defendant was personally served with process in New York, while on his way to the Republic of Bolivia, to which he had been accredited as minister by the Republic of France. Bolivia, although it had not yet accepted him as minister, did so in due course after his arrival at La Paz; and it is to be understood that, in order to reach his post, the most convenient way was for him to pass through the City of New York, and that he had not been loitering there at the time he was served. The defendant pleaded as a defense to the action that, as an accredited diplomat he was exempt from personal service; and the plaintiff moved to strike out the defense. Judge Caffey denied the motion;[1] thereupon the defendant moved to dismiss the suit, and it is from the grant of that motion that the appeal has been taken. The parties have not raised the question whether the defendant's immunity, if it existed, was, properly speaking, a defense to the action, or whether the complaint should have been left to stand against the possibility that valid service might later be made. Since they have apparently agreed that the appeal shall turn upon the single issue of diplomatic immunity, we shall discuss nothing else. Moreover, since the defendant was served while the cause was in the state court, the law of New York determines its validity, and, although the courts of that state look to international law as a source of New York law, their interpretation of international law is controlling upon us, and we are to follow them so far as they have declared themselves. Whether an avowed refusal to accept a well-established doctrine of international law, or a plain misapprehension of it, would present a federal question we need not consider, for neither is present here.

The point has arisen three times in New York courts. The first decision was Holbrook v. Henderson,[2] decided by the General Term of the Superior Court of the City of New York in 1839. The defendant, who was the minister of the Republic of Texas accredited to France and England, was arrested and held to bail in an action on a debt, while passing through the City of New York. It does not appear what the form of action was; but, not only was the defendant released from arrest, but "the process issued in the case" was discharged. The second case was Wilson v. Blanco,[3] an affirmance by the same court without opinion of a decision at "special term" of O'Gorman, J. The defendant was the Venezuelan minister, accredited to France, and on his way to his post, was served with a summons merely. The opinion, rendered at "special term," went on the authority of Holbrook v. Henderson, supra. Judge O'Gorman recognized that that case had involved the arrest of the defendant, but he held that the principle there laid down would cover service of only a summons, and he accepted it as authoritative. So the matter rested until the decision of Judge Proskauer in Carbone v. Carbone,[4] in which a diplomat in transitu was served with a summons in a matrimonial action. Judge Proskauer construed the doctrine of Holbrook v. Henderson, supra, as limited to release from arrest, and refused to vacate the service, saying that in Wilson v. Blanco, supra, the Superior Court had misapprehended its own earlier ruling. In this he was correct, for the rationale of the opinion in Holbrook v. Henderson, supra, was taken from Vattel, who had limited the immunity to an arrest, or other restraint. Moreover, although, as we have said, the "process was discharged," which meant that personal jurisdiction was lost with the arrest, the only writ was presumably the capias, and when that was discharged nothing remained. Whether in 1839 an action of assumpsit—if the action was in fact in assumpsit—could have been commenced in New York otherwise than by a capias we do not know; nor is that material here. Having so disposed of Wilson v. Blanco, supra, Judge Proskauer, relying chiefly upon a passage in Oppenheim,[5] limited the immunity of a diplomat in transitu to jus transitus innoxii; and therefore held that, although the defendant

---

[1] Bergman v. De Sieyes, D.C., 71 F. Supp. 334.

[2] 4 Sandf. 619, 6 N.Y.Super.Ct. 619.

[3] Super., 4 N.Y.S. 714.

[4] 123 Misc. 656, 206 N.Y.S. 40.

[5] Vol. 1, "Peace," § 398.

might not be detained while going to or coming from his post, there was no reason why he should not be subject to civil process.

So the law of New York stands, and it must be owned that the result is not clear. The most recent authority on the matter in international law is "The Research in International Law" of the Harvard Law School, published in 1932—a "Restatement," so to speak, of international law. Article 15 of this[6] recognizes the jus transitus innoxii, but goes no further; and the "Comment," which discusses the authorities at length, at best leaves open the question as to civil process, with perhaps some intimation that as to it there is no immunity. However, the whole question of diplomatic immunity among other matters was considered at the Sixth International Conference of American States at Havana in 1928; and the result was embodied in the Eleventh "Appendix" to report of the United States delegates to the Secretary of State. The preamble to this "Appendix" was in part as follows: "Acknowledging the fact that diplomatic officers represent their respective states and should not claim immunities which are not essential to the discharge of their official duties, and acknowledging also that it would seem desirable that either the officer himself or the state represented by him renounce diplomatic immunity whenever touching upon a civil action entirely alien to the fulfilment of his mission:

"There being no possibility, nevertheless at the present moment, of agreeing to general stipulations which, although forming a well-defined trend in international relations, sometimes conflict with the established practices of various states in a contrary sense;

"Therefore and until a more complete regulation of the rights and duties of diplomatic officers can be formulated;

"Have" (that is, the agreeing states have) "decided to conclude a convention incorporating the principles generally accepted by all nations."

Among the "Articles" which followed, "Article 19" declared that "diplomatic officers are exempt from all civil or criminal jurisdiction of the state to which they are accredited;" and "Article 23" declared that "persons belonging to the mission shall also enjoy the same immunities and prerogatives in the states which they cross to arrive at their post or to return to their own country." The important feature of this "Convention" is that, although it in general deprecates diplomatic immunity from civil process, it makes no distinction between diplomats in transitu and those in situ; and it does this in a convention which professes to incorporate "the principles generally accepted by all nations." Thus its constitutes weighty authority: i.e., the consensus of opinion of the distinguished lawyers there assembled as to what "principles" on the subject were at that time "generally accepted" as a part of international law.

Even so, in the end on authority the matter is not free from doubt; and for that reason we feel free to consider it as res integra, assuming for that purpose that diplomats in situ do have immunity from service of process, though unaccompanied by arrest and limiting ourselves to whether there are tenable grounds for distinguishing the case of diplomats in transitu. It is true that the civil immunity of diplomats in situ from service of process in personam was itself long delayed in spite of the Act of the Seventh of Anne; for it was not until 1859 that the English courts decided that it existed;[7] and as late as 1888 it remained uncertain whether the immunity extended to diplomats in transitu.[8] The reasons given for the immunity of either have been two: the indignity to the sovereign from the arrest of his representative, or even from subjecting him to suit; and the interference with his duties which either arrest or service entails. The first reason has now less weight than it used.; and in any event it is of much less consequence in a civil action than in a criminal prosecution. However, so far as it still counts at all, there would seem to be no

---

6 Vol. I, p. 85.

7 Magdalena Steam Navigation Co. v. Martin, 2 Ellis & Ellis 94.

8 New Chile Gold Mining Co. v. Blanco, 4 Times Law Rep. 346.

difference between a diplomat in transitu and one in situ. On the other hand, the second reason is weightier in the case of a diplomat in transitu, for it will ordinarily more interfere with the discharge of his duties to be obliged to attend the trial of an action pending in a third state, than that of one pending in the state of his post. Moreover, in recent times there is an added support for refusing to recognize any distinction. The interest of the state of transit in denying the immunity is to allow to its own citizens the opportunity to sue upon their claims in their home state; but it is doubtful, now that air travel has become so general, whether that opportunity will prove of much value. At least in the case of large claims, if they are known to the diplomat, he will not be likely to expose himself to an action which he can avoid so easily without that circuity of route formerly necessary. Thus, whatever there may be said, in line with the suggestions of the Havana Conference, for allowing civil actions to be brought against diplomats in all cases, it would appear, both from the point of view of the citizens of the third state, and from that of interference with the diplomat's performance of his duties, that there are better reasons for favoring the immunity of a diplomat in transitu. Lest it be suggested that in any event the immunity should be conditioned upon reciprocity, it is well to mention the decision of a French court in 1840[9] mentioned in the Harvard Research in International Law,[10] which is said to have held that a Revolutionary Law—13 Ventôse, An. II—gave immunity to an American consul en route to Genoa; though, whether the case involved an arrest, or merely the service of civil process, does not appear.

■ In conclusion, therefore, we are disposed to believe that the courts of New York would today hold that a diplomat in transitu would be entitled to the same immunity as a diplomat in situ. It is scarcely necessary to add that that immunity would be altogether frustrated, in the case of all diplomats seeking their posts for the first time, if it were limited to those already accepted by the sovereign to whom they are accredited. If such a limitation should be thought to exist in § 252, Title 22, U.S.Code, it is not relevant to the situation at bar.

Judgment affirmed.

---

[9] Beyley v. Piedanna & Mauroy, Tribunal of the Seine.

[10] Vol. I, p. 87.