Chief Judge Fuld.
We must decide, on this appeal, whether, as a matter of customary international law, premises owned by a foreign state and devoted exclusively to consular and other public governmental uses, are exempt from the imposition of real property taxes by the municipal government where the property is located.
The Republic of Argentina, owning property located in the Borough of Manhattan which it uses as its consulate, instituted this action against the City of New York in 1967. In the first count of its two-count complaint, it seeks the return of the real property taxes it paid on that property between 1947 and 1965 and, in the other count, it prays for a judgment — pursuant to article 15 of the Real Property Actions and Proceedings Law— declaring those premises tax exempt and discharging the tax liens imposed against the property for unpaid taxes assessed since 1966. Upon cross motions for summary judgment, the court at Special Term found for the city and dismissed the complaint. The Appellate Division affirmed, and the Republic of Argentina seeks a reversal in our court. The United States Government, appearing as amicus curice, has argued in support of Argentina’s position.
The premises involved were purchased by the plaintiff in 1947 and used, since that time, solely by its governmental agencies. The principal occupant of the premises, since 1960, has been the Argentine Consul General for the City of New York. After making an initial payment, representing taxes which had accrued against the prior owner of the property, Argentina paid no taxes to the city during the period between 1947 and 1960, when a lump sum payment was agreed upon in settlement of all past accrued taxes. From that year until February of 1966, the plaintiff paid the taxes as they were assessed, albeit under protest. In August of that year, however, the Argentine Government notified the city that it considered itself exempt from taxation under international law, and the present action was commenced in February, 1967.
On this appeal, the plaintiff argues that its immunity from taxation is established by the customs and practices of nations which are binding on state and local governments as a form of (to quote from the plaintiff’s brief) “federal common law”. The city does not dispute that it is bound to observe interna *258 tional law but it contends that there is no established rule which prevents local taxation of consular offices in the absence of a treaty.
Although the United States at one time took a position similar to that now taken by the city, the Government has, at least since 1965, adopted a contrary view. Its present official position is set forth in a letter written, on September 2, 1965, by Richard D. Kearney, an Acting Legal Advisor to the Department of State, to the Comptroller of the City of New York:
“ The Department of State is of the opinion that under recognized principles of international law and comity the several states of the United States, as well as their political subdivisions, should not assess taxes against foreign government-owned property used for public noncommercial purposes.”
The Kearney letter cited a number of reasons for the view expressed, including (1) the practices of other countries; (2) the trend among political subdivisions of the United States to grant such exemptions; (3) the serious political consequences which would attend upon any attempt to enforce a tax assessment by evicting a foreign government from its property; and (4) the lack of any valid basis for distinguishing between foreign state-owned personal property or embassy real property — which •classes of property are concededly exempt from taxation — and other real property used for governmental purposes.
In view of the position taken by the United States, the city, emphasizes that, in deciding this case, the court is not bound to accept the Government’s submission but must make its own determination as to the status of Argentina’s property under international law.[1] This is perfectly true but, recognizing as we must that our conclusion may affect the interests of the nation as a whole, we would be derelict in our duty and responsibility if we were to ignore those interests in reaching decision. The Government asserts, and we are in no position *259 to dispute it, that “ [t] axation by political subdivisions of the United States of foreign government-owned real property used for official purposes has been a growing irritant in the conduct of the foreign relations of the United States. If left unchecked, such taxation will prejudice and hamper the effective conduct of our foreign relations.”[2]
However, as already indicated, we do not premise our decision solely upon what the Government urges are to its best interests. The evidence at hand establishes that granting a tax exemption in this case is mandated by the rules of international law. It is settled that, where there is neither a treaty, statute nor controlling judicial precedent, all domestic courts must give effect to customary international law. To ascertain what it is, * ‘ resort must be had ’ ’, the Supreme Court has said, "to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who, by years of labor, research and experience, have made themselves peculiarly well acquainted with the subject of which they treat.” (The Paquete Habana, 175 U. S. 677, 700; see, also, Hilton v. Guyot, 159 U. S. 113,163.)[3] And the most authoritative of such works are international conventions, codifying or declaring existing law. These are carefully drafted documents, prepared by representatives of many different countries and intended to reflect the rules to which nations generally conform. (See, e.g., Statute of the International Court, 59 U. S. Stat. 1031, 1055; Murarka v. Bachrach Bros., 215 F. 2d 547; Bergman v. De Sieyes, 170 F. 2d 360, 362.)
With respect to the particular question before us—namely, the tax status of government-owned consular offices—the docu *260 ment which most clearly sets forth the applicable international standards of conduct is the Vienna Convention on Consular Relations, drafted in 1963 under the auspices of the United Nations with the active participation of representatives from the United States and 91 other countries. This document, which has already been ratified by 33 nations, explicitly announces that (art. 32, § 1)
‘ ‘ Consular premises and the residence of the career head of consular post of which the sending State or any person acting on its behalf is the owner or lessee shall be exempt from all national, regional or municipal dues and taxes whatsoever, other than such as represent payment for specific services rendered.” (Emphasis supplied.)
The Convention has not yet been considered by the Senate for formal ratification by the Government and is, consequently, not absolutely binding upon our courts. However, it does constitute “ weighty authority: i.e., the consensus of opinion of the distinguished lawyers there assembled as to what ‘ principles ’ on the subject were at that time [1] generally accepted ’ as a part of international law.” (Bergman v. De Sieyes, 170 F. 2d 360, 362, supra.)
In the Kearney letter —• in which the State Department noted that, ‘ ‘ under recognized principles of international law and comity”, the property owned by a foreign government and used for public noncommercial purposes should be exempt from local taxation—the United States Government was clearly indicating its agreement with the rule expressed by the Vienna Convention. The acceptance of this principle by other nations has been demonstrated by a survey conducted by the United States, revealing that, of the 45 nations in which our Government maintains consulates, only six fail to accord a tax exemption to consular offices located within their territory and that most of the countries which have granted such exemption have done so without prior treaty or agreement.
The reason so many nations refrain from imposing real estate taxes on foreign consulates is easily discerned. Quite apart from *261 concepts of international comity and regard for another State’s sovereignty, it would be difficult, if not impossible, to enforce the collection of any tax levied against a friendly foreign government if the latter were not disposed to pay it. (See Yin-Tso Hsiung v. Toronto, [1950] 4 D. L. R. 209; City of St. John v. Fraser-Brace, 13 D. L. R. 2d 177; see, also, Reference re Tax on Foreign Legations, [1943] 2 D. L. B. 481 [embassy property] ; French Republic v. Board of Supervisors of Jefferson County, 200 Ky. 18 [personal property]; Bishop, Immunity from Taxation of Foreign State-Owned Property, 46 Am. J. Int. L. 239, 256.)
The unenforceability of a claim for taxes stems from the fact that no sovereign state can itself be sued without its consent, and its governmental property is not susceptible to attachment, levy or seizure by the courts or other authorities of a foreign country. (See, e. g., Schooner Exch. v. M’Faddon, 7 Cranch [11 U. S.] 116, 137; Hassard v. United States of Mexico, 173 N. Y. 645, affg. 46 App. Div. 623, affg. 29 Misc. 511, 512.) This principle of sovereign immunity—which is, of course, acknowledged by the city—renders the levy and assessment of a tax against Argentina a futile gesture, serving only to embarrass a friendly State without any concomitant benefit to the city. Indeed, concluding that the levy by a local government of a tax which it lacks the power to collect ‘ ‘ would be misleading ” since its records “would show assets * * * not, in fact, available to [it] ”, the Supreme Court of Canada wrote as follows (Reference re Tax on Foreign Legations, [1943] 2 D. L. R. 481, 503-504, supra):
"It would be an empty procedure for the municipal council to enter on its assessment roll amounts of taxes against property owned and occupied by foreign states, for, as they are uncollectable, the municipal council, at the end of the year, would find the amount in its hands available for its municipal purposes, as shown by its budget, deficient to the extent of the aggregate amount of taxes uncollectable against foreign states or diplomats. Thus it could not succeed in making both ends meet—^as it must.”
*262 Although the case involved embassy property, the court’s reasoning applies equally to property used as a consulate, and the City of New York, which has a difficult enough time in formulating a realistic budget, ought not include on its assessment rolls real property, the taxes on which can never be collected.
The corporation counsel contends, in attempted refutation, that its claims for unpaid taxes constitute a lien on the property upon which it would be able to act when and if the foreign government disposes of the premises to an entity which is not immune from foreclosure proceedings. The city, however, has no power to transform its tax claim into a lien. Just as it may not compel the payment of a tax by proceeding directly against the plaintiff’s property, its imposition of a lien, which would affect the property indirectly by reducing the sum it could realize on a sale to a subsequent purchaser, would constitute an impermissible exercise of jurisdiction over another state’s property. This, indeed, was the view taken by the Canadian court in the Foreign Legations case when confronted with the very argument now made by the city ([1943] 2 D. L. R., at pp. 500-501):
“ So long as the property is devoted to [diplomatic] uses, the territorial sovereignty admittedly cannot enforce a charge; but, if the property is transferred, does the charge stand as against the purchaser? If so, the statutory proceeding is only a method of enforcing indirectly the law of the territorial jurisdiction against the public property of the foreign Sovereign. It would be the assertion of ‘ a right * * * over the property of a foreign sovereign not arising from any voluntary action on Ms part, which adversely affected his property ’, because obviously the charge would affect the price for which the property could be sold.” (Emphasis supplied.)
In other words, since a lien has an immediate adverse effect upon the amount which the government would receive on a sale, to sanction its imposition would constitute a direct interference with the property of a foreign state and, as such, would violate the principle of sovereign immunity.
Of course, this inability to enforce a tax claim does not preclude a government, which wishes to do so, from assessing a *263 tax in the hope that it might he paid voluntarily. (See Restatement, 2d, Foreign Relations Law of the United States, § 65, comment d.) There is, however, a more fundamental reason which prevents a municipality from levying a tax on the property of a foreign nation using it in its governmental capacity. The same respect for the “ perfect equality and absolute independence of sovereigns ” (Schooner Exch. v. M’Faddon, 7 Crunch [11 U. S.] 116, 137, supra), which exempts a nation and its property from the interference of another state’s judicial process, also demands that it be immune from any obligation to support the functioning of another government through the payment of taxes. This thought, too, was well expressed in the Foreign Legations case ([1943] 2 D. L. R., at p. 492): “As regards taxes * * * they are imposed by the authority of the state, whether immediately, or mediately, through a municipality or other agency. The imposition of a tax presupposes a person from whom, or a thing from which, it is exacted or collected. It is so exacted, or collected, in virtue of superior political authority. It does not require much argument to establish that, consistently with the general principles enunciated in the authorities [relating to sovereign immunity from judicial proceedings] already quoted, such an exaction cannot be demanded by one equal sovereignty from another, or from its diplomatic agent; and there is a general acceptance of the view that such tribute is not exigible, consistently with the principles of the law of nations.” (See, also, City of St. John v. Fraser-Brace, 13 D. L. R. 2d 177, 192-193, supra; Yin-Tso Hsiung v. Toronto, [1950] 4 D. L. R. 209, 212-213, supra.) Certainly, if the host state may not tax a foreign sovereign, it follows that no political subdivision may do so.
The attempt by the city to distinguish the Foreign Legations decision on the ground that the case now before us involves “consular” rather than “diplomatic” property must fail. Although one occupying a consular office may originally have been regarded as a “ commercial agent ” rather than a “ diplomatic officer,” the fact is that today such an official not only looks after the commercial interest of the nation he representsc but he also performs a wide range of purely governmental services for its nationals—such as the performance of marriages and the adjudication of disputes—as well as for *264 nationals of the country in which he is stationed—such as the issuance of travel visas.[4] More significantly, for present purposes, a consul, similar to an ambassador, acts as the spokesman and representative of his government in the area to which he is assigned. (See Republic of Finland v. Town of Pelham, 26 A D 2d 35, 37; see, also, Bishop, Immunity from Taxation of Foreign State-Owned Property, 46 Am. J. Int. L., 239, 248; Lee, Consular Law and Practice, p. 60.) Professor Lee, an authoritative commentator on consular practices, has analyzed this aspect of a consul’s role as follows (p. 60):
“ [A] consul within his district performs many functions essentially comparable, though local in nature, to those performed by a diplomat situated at the seat of the capital. In other words, the relationship between a consul and the local authorities is not altogether unlike that between a diplomat and the central authorities. A consul, thus, may be called upon to exert and utilise all his ‘ diplomatic ’ qualities in his dealings with the local-authorities. This is in addition to the time-honoured and other specially authorized duties a consul is expected to perform.”
It is, perhaps, for this reason that almost every nation, including the United States, has, since the 1920s, abandoned the traditional distinction between consular and diplomatic personnel and today employ the same foreign service officers, interchangeably, in ambassadorial or consular roles. (See Foreign Service Act of 1924, 43 U. S. Stat. 140; Lee, Consular Law and Practice, p. 310.) The distinction which the city seeks to draw between diplomats who perform a public governmental function and consuls who act in a purely commercial and private capacity “ lacks,” in the words of one writer, "reality in the mid-twentieth century” (Bishop, Immunity from Taxation of Foreign State-Owned Property, 46 Am. J. Int. Law, 239, 248) and may not be relied upon as a basis for subjecting the governmental office of a foreign state to the taxing jurisdiction of a municipal government. Thus, the Ontario High Court, ° rejecting the suggested distinction, held in the Yin-Tso Hsiung case that “ the property of a foreign state occupied by its Consul *265 and used for the public purposes of such state [as a consulate] are not liable to taxation by municipal corporations in this Province ” ([1950] 4 D. L. R 209, 217, supra).
In short, then, the test of immunity is not whether the property is used for a “ diplomatic ” purpose but, rather, whether it is used for a “ public ” or “ governmental ” purpose and, accordingly, it follows that consular property owned and maintained by a foreign government is exempt from local real estate taxation, just as is its ambassadorial property, under principles of customary international law.
However, this does not mean that the Republic of Argentina is entitled to all of the relief demanded. The first cause of action, which seeks the refund and recovery of taxes paid in the past, was properly dismissed since it conclusively appears that the plaintiff failed to comply with provisions of the city’s Administrative Code insofar as they require that one who prosecutes a claim against the city for a money judgment must allege and establish that he has previously presented to the Comptroller a demand for the relief sought. (Administrative Code of City of New York, § 394a-1.0, subd. a; see Derlicka v. Leo, 281 N. Y. 266, 269.)
The order appealed from should be modified so as to grant the plaintiff summary judgment on its second cause of action and, as so modified, affirmed.
Judges Burke, Scileppi, Bergan, Breitel and Jasen concur.
Order modified, without costs, in accordance with the opinion herein, and, as so modified, affirmed.

. Indeed, this is also the Federal Government’s view. Since the Executive Branch has neither made a suggestion of immunity nor purported to “ legislate ” national policy in this area (cf. Tate letter, 26 Dept. of State Bull. 984), the issue before us — as the Attorney General observed in the course of oral argument — is one for us to decide under principles of international law.

. In view of the many consulates and other government offices which it maintains abroad, the United States unquestionably has a real interest in having the court find that such property is immune from taxation under international law.

. In Hilton v. Guyot, the court expressed the thought in this way (159 U. S., at p. 163): “But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this, the courts must obtain such aid as they can from judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations.”

. Indeed, even when he supports the commereial activities of his compatriots, it may well be urged that a consul is engaging in a governmental function.