446 F.3d 365
 The CITY OF NEW YORK, Plaintiff-Appellee,
v.
THE PERMANENT MISSION OF INDIA TO THE UNITED NATIONS and Bayaryn Jargalsaikhan, as principal resident representative to the United Nations of the Mongolian People's Republic, Defendants-Appellants,
Great American Leasing Corporation and Jane Doe, The names of the last 20 defendants being unknown to the plaintiff, the persons or parties intended to be persons or corporations, if any, having or claiming an interest in or lien upon the property described in the complaint, Defendants.
 Docket No. 05-4260-CV(L).
 Docket No. 05-42639-CV(CON).
 United States Court of Appeals, Second Circuit.
 Argued: January 23, 2006.
 Decided: April 26, 2006.
 
 Norman Corenthal, Assistant Corporation Counsel (Kristin M. Helmers and John Low-Beer, of counsel), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y., for Plaintiff-Appellee.
 John J.P. Howley (Robert A. Kandel and Robert Grass, of counsel), Kaye Scholer LLP, New York, N.Y., for Defendant-Appellee.
 Before: KATZMANN and HALL, Circuit Judges, KORMAN, District Judge.[1]
 KATZMANN, Circuit Judge.
 
 
 1
 This case arises out of the City of New York's (the "City") attempts to collect property taxes from certain foreign missions to the United Nations that have been using parts of their embassy buildings for purposes that, the City argues, render at least those portions of those buildings subject to property taxation. The merits of that claim are not before us in this interlocutory appeal. Instead, we are called upon to answer a preliminary question of first impression in this circuit — whether, pursuant to the "immovable property" exception to the Foreign Sovereign Immunity Act's general rule that a foreign country is immune from suit in our courts, a federal court has jurisdiction to settle this dispute. We agree with the district court that it does have such jurisdiction and that this suit may go forward. The decision of the district court is affirmed and this case remanded for further proceedings.
 
 I.
 A.
 
 2
 While the merits of the City's claim are not before us, we set forth a condensed version of the underlying dispute to give some context to the discussion that follows.
 
 
 3
 The Permanent Mission of India to the United Nations (the "Indian Mission") is housed in a 26-floor building at 235 East 43rd Street in New York City that is owned by the Government of India. The first six floors, basement, and cellar of this building are primarily used for diplomatic offices, while the top 20 floors are devoted to residential units. Housed in these units are 16 diplomatic employees of the mission (all below the rank of Head of Mission or Minister Plenipotentiary) and their families, as well as security personnel and a driver; all of these employees are citizens of India who receive this housing rent-free.
 
 
 4
 The Ministry for Foreign Affairs of the People's Republic of Mongolia (the "Mongolian Mission") is housed in a 6-story building at 6 East 77th Street in New York City that is owned by the People's Republic of Mongolia. The first two floors apparently are used for the mission's offices and the third floor for the Ambassador's apartment. The top three floors are used for six apartments, in which reside, rent-free, lower-level employees of the mission and their families. Both missions assert that, for various reasons, the housing of diplomatic employees on-site is essential.
 
 
 5
 Under New York law, real property owned by a foreign government is exempt from taxation if it is "used exclusively" for diplomatic offices or for the quarters of a diplomat with the rank of ambassador or minister plenipotentiary to the United Nations. N.Y. Real Property Tax L. § 418. On the other hand, "[i]f a portion only of any lot or building... is used exclusively for the purposes herein described, then such portion only shall be exempt and the remainder shall be subject to taxation." Id. At least since 1993, the United States Mission to the United Nations ("U.S.Mission") has indicated its agreement that portions of property not used for the specific purposes stated above, including those portions used to house lower-level diplomatic employees, will be subject to property taxation, absent a contrary bilateral agreement between the United States and the country at issue.
 
 
 6
 In accordance with its interpretation of this state law and applicable treaties, the City has been levying property taxes against the two properties in question for years, but has had no success in getting the missions to pay. By operation of New York law, these unpaid taxes eventually converted into tax liens held by the City against these two properties. The City alleges that, as of February 1, 2003, the Indian Mission property was subject to about $16.4 million in unpaid property taxes and interest, while the Mongolian Mission owed about $2.1 million.
 
 B.
 
 7
 On April 2, 2003, the City filed separate complaints in state court seeking judgments establishing the validity of the tax liens on the mission buildings.[2] Both missions (represented by the same counsel) removed their cases to federal court, where both cases were assigned to Judge Casey. After discovery limited to the jurisdictional question, the missions moved to dismiss for lack of subject matter jurisdiction.
 
 
 8
 In a thoughtful, well-researched opinion dated July 6, 2005, Judge Casey denied the motions on the ground that these suits implicate the "immovable property" exception to the Foreign Sovereign Immunity Act's ("FSIA") general rule that foreign governments are immune from suit. See City of New York v. Permanent Mission of India to the United Nations, 376 F.Supp.2d 429 (S.D.N.Y.2005). He did not reach the City's alternative argument that the suits also implicate the FSIA's "commercial activity" exception.[3] This interlocutory appeal followed. See Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 387 (2d Cir.2000) (immediate appeal is permitted, pursuant to the collateral-order doctrine, of denial of motion to dismiss for lack of subject matter jurisdiction under the FSIA).
 
 
 9
 Meanwhile, Congress has been actively involved in the issues directly pertaining to this litigation. Provisions included in appropriations bills enacted in each of the past two years require that 110 percent of unpaid property taxes owed by any country be withheld from that country's foreign aid. For unpaid property taxes to be subject to this withholding requirement, however, the amount owed must be determined "in a court order or judgment entered against such country by a court of the United States or any State or subdivision thereof." Foreign Operations, Export Financing, and Related Programs Appropriations Act of 2006, P.L. No. 109-102, § 543 (2005); Consolidated Appropriations Act of 2005, P.L. No. 108-447, § 543 (2004). Thus, this provision cannot be triggered if no court can adjudicate the property tax controversy.
 
 II.
 A.
 
 10
 Against this backdrop, we begin by noting that we review de novo the district court's conclusions of law regarding jurisdiction under the FSIA.[4] Cabiri v. Gov't of the Republic of Ghana, 165 F.3d 193, 196 (2d Cir.1999).
 
 
 11
 The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1988). Under the FSIA, a foreign state is presumptively immune from suit. Saudia Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). However, the FSIA contains several exceptions to this general rule of immunity. The party seeking to establish jurisdiction bears the burden of producing evidence establishing that a specific exception to immunity applies, but the foreign state then bears the ultimate burden of persuasion on this question. See Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir.2002); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir.1993)
 
 B.
 
 12
 In this case, the City argues that jurisdiction lies under the FSIA's "immovable property" exception. This exception provides that a foreign state shall not be immune from jurisdiction in any case in which "rights in immovable property situated in the United States are in issue." 28 U.S.C. § 1605(a)(4). The parties take very different stances on how expansive this exception is. The defendants argue that the immovable property exception is limited to cases in which the parties dispute title, ownership or possession of the immovable property itself. The City argues that the exception extends much more broadly, including to actions to adjudicate the validity of a tax lien. This is a question of first impression in this circuit.
 
 
 13
 We begin, as always, with the language of the provision. See, e.g., United States v. Gayle, 342 F.3d 89, 92 (2d Cir.2003); United States v. Velastegui, 199 F.3d 590, 594 (2d Cir.1999), cert. denied, 531 U.S. 823, 121 S.Ct. 67, 148 L.Ed.2d 32 (2000). Its general parameters are clear in two respects, neither of which is disputed by either party. First, it is restricted to "immovable property situated in the United States," i.e., real estate located in this country. Second, its application is limited to cases in which rights in such real estate "are in issue." Thus, it does not apply to disputes that arise out of such rights in real estate but do not actually place them at issue. See Asociacion de Reclamantes v. The United Mexican States, 735 F.2d 1517, 1523 (D.C.Cir.1984) (Scalia, J.).
 
 
 14
 What is controverted here is what is meant by "rights in" immovable property. Textually, we find that this phrase is more plausibly read to support the City's position than the defendants'. By its terms, the provision does not limit itself to cases in which the specific right at issue is title, ownership, or possession, and it certainly does not specifically exclude cases in which the right at issue is a lien.[5] Nor does the plain language restrict this provision to cases where the foreign government's rights in the property are in issue, as defendants suggest; a purely textual analysis suggests that it would suffice that the City's rights in the property (which are simply the flip side of the defendants' obligations with respect to the property) are in dispute. However, the text also does not explicitly confirm the City's position, and we find it sufficiently ambiguous that an investigation of the legislative history is in order. See Gayle, 342 F.3d at 93-94 ("Resort to authoritative legislative history may be justified where there is an open question as to the meaning of a word or phrase in a statute, or where a statute is silent on an issue of fundamental importance to its correct application.").
 
 
 15
 Until the middle of the last century, the United States followed what is known as the "classical or virtually absolute theory of sovereign immunity," the animating principle of which was that "a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign." See Letter from Jack B. Tate of May 19, 1952, 26 Dep't of State Bull. 984 (1952) (the "Tate Letter"), reproduced in Dunhill v. Republic of Cuba, 425 U.S. 682, 712, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). In 1952, the Tate Letter announced the United States' decision to join most other countries in switching to the so-called "restrictive theory" of sovereign immunity, under which "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis)." Id. at 711, 96 S.Ct. 1854. It is clear from the legislative history and settled in our caselaw that Congress's intent in enacting the FSIA was to largely codify the restrictive theory of sovereign immunity set forth in the Tate Letter. See H.R. Rep. 94-1487 (1976) (the "House Report"), reprinted at 1976 U.S.C.C.A.N. 6604, 6605; Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 612, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). Applying the general principle that animates the Tate Letter and, thus, the FSIA itself — immunity is available only where a state is acting in a sovereign capacity, and not with respect to a state's "private acts" — we think ownership of real estate in a foreign country must be considered the latter, because ownership itself is not inherently a sovereign act.
 
 
 16
 With respect to the specific issue confronting us, the Tate Letter says only: "There is agreement by proponents of both [the classical and the restrictive] theories, supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps consular property excepted)." Tate Letter at 711. Defendants argue that this passage in the Tate Letter (assumed to be adopted by the FSIA) precludes jurisdiction for cases involving diplomatic property. However, as actually codified in the FSIA, the diplomatic property exception applies only to protect property used for such purposes from attachment or execution following a judgment. See 28 U.S.C. § 1610(a)(4)(B) (stating that immovable property situated in United States is subject to attachment, "Provided, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission"). Thus, it is quite clear from the text that the FSIA does not bar jurisdiction, but does bar certain remedies, on the basis of a property's diplomatic status.[6]
 
 
 17
 This understanding is confirmed by reliable legislative history. In general, the House Report restates the immovable property exception in terms as broad as, or even broader than, those used in the text itself. See House Report at 6618 (provision "denies immunity in litigation relating to rights in real estate"). In addition, it confirms that consideration of a property's diplomatic status takes place with respect to available remedies, not with respect to jurisdiction. See id. at 6619 ("Actions short of attachment or execution [of the diplomatic property] seem to be permitted under the [Vienna Convention on Diplomatic Relations], and a foreign state cannot deny to the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters, as long as the foreign state's possession of the premises is not disturbed.").[7]
 
 
 18
 Moreover, the narrow interpretation of the immovable-property exception put forward by defendants is difficult to square with Congress's explicit reliance on the courts to adjudicate the property tax liabilities of foreign governments. See Foreign Operations, Export Financing, and Related Programs Appropriations Act of 2006, P.L. No. 109-102, § 543 (2005); Consolidated Appropriations Act of 2005, P.L. No. 108-447, § 543 (2004) (requiring that amount owed be determined "in a court order or judgment entered against such country by a court of the United States or any State or subdivision thereof" before it is withheld from foreign aid). Here, adoption of the defendants' proposed interpretation of FSIA would make dead letters out of Congress's recent enactments, which were intended to address the exact controversy before us today, because no court could provide the adjudication required to trigger them. We do not lightly reach such a result, and certainly will not do so where nothing in the statutory language or legislative history remotely requires it.
 
 
 19
 Finally, because the FSIA was intended to codify an already existing practice of following the restrictive theory of sovereign immunity, and because that policy was itself meant to bring the United States into conformity with other countries that had already adopted or were in the process of adopting the restrictive theory, it is instructive to look at contemporaneous expressions of the content of this exception to sovereign immunity for actions involving real property owned by the foreign state. See Reclamantes, 735 F.2d at 1521. First, the Restatement (Second) of Foreign Relations Law of the United States, the most recent restatement at the time of the FSIA's adoption, states that a foreign state's immunity does not extend to "an action to obtain possession of or establish a property interest in immovable property located in the territory of the State exercising jurisdiction." Restatement (Second) of Foreign Relations Law of the United States § 68(b) (1965). Thus, at the time of the FSIA's adoption, any action to "establish a property interest in immovable property" was permissible.[8]
 
 
 20
 Second, the European Convention on State Immunity, which was drafted in 1972 and ratified in 1976, just prior to the enactment of the FSIA, states:
 
 
 21
 A Contracting State cannot claim immunity from the jurisdiction of a court of another Contracting State if the proceedings relate to: (a) its rights or interests in, or its use or possession of, immovable property; or (b) its obligations arising out of its rights or interests in, or use or possession of, immovable property and the property is situated in the territory of the State of the forum.
 
 
 22
 European Convention on State Immunity, May 16, 1972, ETS No. 74 ("European Convention"), art. 9. The European understanding — presumably known to the drafters of the FSIA — was that this exception covered a broad range of suits, including those arising out of the foreign state's obligations stemming from its ownership of property.
 
 
 23
 Of course, we must take note that Congress elected not to use the far more detailed language of the European Convention. Yet nothing in the vague but broad formulation used in the FSIA ("rights in immovable property situated in the United States are in issue") precludes its interpretation as synonymous to the European Convention's version. The European Convention version is split into two prongs, the first covering the foreign state's rights in the immovable property and the second addressing the state's obligations arising out of its ownership of property. Congress did not simply adopt language tracking the first prong, and thereby limit the reach of the immovable-property exception to cases in which the foreign state's rights in the property are at issue, but rather passed a provision that does not specify whose rights must be at issue. As indicated, supra, we think this provision therefore is most naturally read to cover not only the foreign state's rights in the property but also its obligations, i.e., rights retained in the property by the local state or another party.
 
 
 24
 Shortly after the FSIA's passage, the International Law Commission (the "ILC") began work on what is now known as the United Nations Convention on Jurisdictional Immunities of States and Their Property (the "U.N. Convention"). In 1983, it finalized its version of the immovable property exception, which largely tracks the European Convention's version.[9] At that time, the United States member of the ILC stated his understanding that "[t]his article embodies the `exception' to state immunity that is contained in [the FSIA] but is considerably more detailed." Stephen C. McCaffrey, The Thirty-Fifth Session of the International Law Commission, 78 Am. J. Int'l L. 457, 465 (1984). On December 2, 2004, after two decades of negotiations over the wording of other, more contentious provisions such as the "commercial activity" exception, the United Nations General Assembly adopted the U.N. Convention. See David P. Stewart, The UN Convention on Jurisdictional Immunities of States and Their Property, 99 Am. J. Int'l L. 194, 194 (2005) (hereinafter, "Stewart, The UN Convention"). While expressing some concern about other provisions, the U.S. Mission applauded the U.N. Convention's exception for "claims with respect to rights or interests in real property within that foreign State," one of the exceptions that it declared "are widely recognized" and "have worked well." Statement by Eric Rosand, Deputy Legal Counselor, United States Mission to the United Nations, Oct. 25, 2004.[10]
 
 
 25
 Not only did the ILC draft a broad and detailed version of the immovable property exception, it gave a coherent account of why such an exception has always been recognized, even under the absolute theory of sovereign immunity. The acquisition and continued ownership of property in a foreign country "is made possible only by virtue of the application of the internal law or private law of the State of the situs." International Law Commission, Documents of the Thirty-Fifth Session, II Y.B. Int'l L. Comm'n 47, U.N. Doc. A/CN.4/363 and Add.1 [1983]. Because ownership itself is only possible through the operation of local law, "[t]he outside State or extraterritorial State as an outsider must, from the start, fully recognize and respect the local or territorial internal law which unquestionably governs the legal relationship between the foreign State and the property so acquired." Id.
 
 As the district court aptly put it:
 
 26
 Foreign governments own, use, and possess land subject to the unique regulations of the forum jurisdiction; their property rights derive from, and are protected by, that regime.... [D]efendants purchased the land subject to New York's property law, including real-estate taxes and liens to enforce them.
 
 
 27
 City of New York, 376 F.Supp.2d at 435. We agree. Ownership of property connotes a bundle of related rights and obligations defined by local property law. A foreign state cannot assume the benefits of ownership — including the right to exclude others from the property with the assistance of the local government and, significantly, the right to sue those who violate its rights — while simultaneously disclaiming the obligations associated with them. When owning property abroad, a foreign state must follow all the same laws that pertain to private owners of such property, except to the extent that it can point to specific exceptions in that country's agreements with the United States, treaties, or other sources of law.[11] This principle — when owning property here, a foreign state must follow the same rules as everyone else — long predated the restrictive theory of sovereign immunity and the FSIA. See The Schooner Exch. v. M'Faddon, 7 Cranch 116, 11 U.S. 116, 145, 3 L.Ed. 287 (1812) ("A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual."). We see no evidence that the FSIA was meant to alter it.[12]
 
 
 28
 We conclude that the "immovable property" exception to foreign sovereign immunity should be construed to include any case where what is at issue is: (1) the foreign country's rights to or interest in immovable property situated in the United States; (2) the foreign country's use or possession of such immovable property; or (3) the foreign country's obligations arising directly out of such rights to or use of the property.[13] We think this interpretation is the most consistent with the broad, albeit vague, language of the provision itself, as well as with the FSIA's general principle of withdrawing sovereign immunity where states act in the same manner as private actors. In addition, it gives effect to the intent of the FSIA's drafters "to bring American sovereign immunity practice into line with that of other nations." Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 310 (2d Cir.1981).
 
 
 29
 While this is our circuit's first opportunity to construe the immovable property exception, several of our sister circuits have done so before us. The first and most comprehensive of these opinions, Reclamantes, authored by then-D.C. Circuit Judge Antonin Scalia, rejected a claim by the successors in interest to the recipients of land grants from Mexico who were driven from their land by the United States and Texas in the period following the Mexican-American War. 735 F.2d at 1519. These plaintiffs claimed that, as a result of various subsequent events, Mexico had assumed the responsibility for compensating them for their lost land but had not done so. Id. at 1519. After recognizing that the plain language of the immovable property exception was "imprecise," Reclamantes delved into the legislative history and concluded, as we do, that the immovable property exception was enacted to codify "the pre-existing real property exception to sovereign immunity recognized by international practice." Id. at 1521. Under international practice at the time of the FSIA's enactment, the real property exception was "limited to disputes directly implicating property interests or rights to possession." Id. at 1522. By contrast, the Reclamantes plaintiffs' claims for compensation were not "property interests in real estate, such as a leasehold, easement or servitude, nor possessory rights, nor even rights to payment of money secured by an interest in land." Id. at 1523. The involvement of real property in the suit was "purely of historical interest, having no bearing upon present property interests." Id. at 1523.
 
 
 30
 We agree with the holding of Reclamantes, i.e., that the immovable property exception is limited to disputes directly implicating present property interests,[14] as well as the methodology it employed (looking at international practice around the time of the FSIA's enactment). Moreover, we agree with Reclamantes' suggestion in dicta that a broad range of property interests (including a security interest) can satisfy the exception. While Reclamantes had no occasion to specify with precision the types of property interests that would qualify, and so did not consult the international sources that we have consulted to provide a more detailed and workable standard, we think our holding today is entirely consistent with that case, and indeed builds upon the groundwork it laid.[15]
 
 C.
 
 31
 Applying the standard we have described above to the facts of this case is simple. What is in dispute in this case is the extent of defendants' obligations under local law (here, property taxes) arising directly out of their ownership of real property in the United States.[16] The immovable property exception thus provides jurisdiction over this matter. Having reached this conclusion, like the district court, we decline to decide whether the commercial-activity exception is also implicated on these facts.
 
 
 32
 Although our conclusion is based on conventional methods of statutory interpretation, because of the politically sensitive nature of this case, we also have carefully considered the defendants' and the United States' arguments sounding in public policy and find that we are not persuaded.[17] In particular, we do not agree that our holding permits the City and other litigants to use creative pleading to "bootstrap" claims against foreign governments that otherwise would find no jurisdiction under the FSIA into exercises of the immovable property exception. The rule of Reclamantes — the dispute in question must actually arise directly out of the property interest in question — makes such fears groundless.
 
 
 33
 The instant dispute appears to revolve around the proper interpretation of a treaty (the Vienna Convention on Diplomatic Relations) and the application of that treaty to these facts. The Supreme Court has made clear that such a controversy is well within the competence and authority of the federal courts and is not a non-justiciable political question. See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (stating that "the courts have the authority to construe treaties"); Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."). Leaving such construction to the courts does not threaten the United States' compliance with international protections for diplomatic property; rather, the alternative — granting dismissal for want of jurisdiction whenever a defendant can raise a plausible claim of the treaties' applicability — could effectively expand the treaties' scope. In addition, Congress has specifically given to the courts — by way of a bill signed into law by the President — the role of deciding what property taxes are due from federal governments.[18]
 
 
 34
 We emphasize once again that the merits of this dispute are not before us. We express no opinion as to whether the City is correct that it may levy property taxes on those portions of embassy buildings that are used to house lower-level diplomatic employees. Nor do we express any opinion today as to what sorts of remedies will be available to the City should it prevail on its claim. Rather, we hold only that the district court was correct in finding that it had jurisdiction to hear the controversy.
 
 III.
 
 35
 Accordingly, the opinion of the district court is affirmed, and this case is remanded for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Edward R. Korman, Chief United States Judge for the Eastern District of New York, sitting by designation
 
 
 [2]
 Two other countries were also sued in this high-profile action. The City claimed that Turkey owed $70 million and that the Philippines owed $17.7 millionSee Thomas J. Lueck, Bloomberg Sues 4 Countries, Saying They Owe City $100 Million, N.Y. Times, 4/10/03, at D3. Turkey, which the City alleged had rented out part of its consulate to the Bangladesh Mission, settled for $6 million. See Joanne Wasserman, City Plucks 6M in Taxes From Turkey, N.Y. Daily News, 10/1/03, at 19. Meanwhile, the case against the Philippines, which was also assigned to Judge Casey, has proceeded to summary judgment on the merits, because the Philippines chose not to join the instant motion to dismiss. See City of New York v. Republic of the Philippines, 03-cv-6085, 2004 WL 2710026 (S.D.N.Y.2004) (RCC). We are not aware of any other pending actions of this nature, but the City has publicly named other embassies as offenders, and so may well seek to initiate further proceedings if successful here. See William Sherman and Bob Port, A Towering Slap in City's Face, N.Y. Daily News, 10/24/04, at 4 (citing Hungary, Guinea, Nepal, and Nigeria in addition to the countries already mentioned).
 
 
 [3]
 This exception provides that a foreign state shall not be immune from jurisdiction in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2)
 
 
 [4]
 While we review for clear error any factual findings made by the district court,see Shapiro v. The Republic of Bolivia, 930 F.2d 1013, 1016 (2d Cir.1991), it does not appear that the district court resolved any material factual disputes.
 
 
 [5]
 Defendants argue that liens are not rights in real estate at all, but merely "security interests." We find this argument unconvincing; a security interest is certainly a different type of right than, say, a possessory or ownership interest, but it remains nonetheless a species of "right" as that term is generally understood in the legal systemSee Black's Law Dictionary 1347 (8th ed.1999) (one definition of "right" is "[t]he interest, claim or ownership that one has in tangible or intangible property"); id. at 941 (defining a "lien" as a "legal right or interest that a creditor has in another's property").
 
 
 [6]
 This does not mean that the FSIA is in conflict with the Tate Letter on this point, because the Tate Letter referenced not simply the jurisdictional aspects of sovereign immunity codified in the FSIA but also the invocation of sovereign immunity as a defense on the merits, where diplomatic property receives some degree of special protection. In particular, the Vienna Convention on Diplomatic Relations, to which the United States is a party, states: "The sending State and the head of the mission shall be exempt from all national, regional or municipal dues and taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered." Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, Art. 23, § 1 (1972). Undoubtedly, the parties will have differing interpretations of what protections this provision offers defendants, but that is a question for the merits, not of jurisdiction under the FSIA
 
 
 [7]
 We do not address today the potential significance of this statement in the House Report with respect to any remedy that the City might seek if successful on the merits, and so it is unnecessary at this stage of the litigation to explore the extent to which a lien is "similar" to ownership, rent, or a servitude. With respect to the rights that can be adjudicated — the question now before us — we disagree with defendants' assertion that this statement limits the rights that can be at issue with respect to diplomatic property to "questions of ownership, rent, servitudes, and similar matters." There is no indication that the drafters of the House Report meant this passage as such a limitation; rather, read in context, it was intended to make clear that any actions that do not disturb a foreign state's possession of the premises are permitted, up to and including suits involving questions of ownership. We observe that the defendants' interpretation has no corollary in the text actually adopted by Congress, which imposes no such limitations on the types of property rights that permit jurisdiction and addresses the subject of diplomatic property only with respect to available remedies, not with respect to available rightsSee York River House v. Pakistan Mission to the United Nations, 1991 WL 206286, 1991 U.S. Dist. LEXIS 13683 (S.D.N.Y.1991) (Leval, J.) (finding that this legislative history could not overcome fact that statutory language contained "neither a clear assertion of, nor even an ambiguous reference to, such an exception").
 
 
 [8]
 Defendants make much of comment d to this rule, which states that the rule "does not preclude immunity with respect to a claim arising out of a foreign state's ownership or possession of immovable property but not contesting such ownership or the right to possession." They argue that this indicates that the exception is limited to cases contesting ownership or possession. However, the illustrations to this comment make clear that it does not limit the types of interests that can be involved, but rather clarifies that those rights must actually be "in issue," to use the language with which the FSIA codified this understanding. For example, the Restatement (Second) notes, a state can bring a proceeding in eminent domain to condemn real property owned by a foreign state. By contrast, the immovable property exception does not preclude immunity in a suit brought by a plaintiff who is injured on the defendant's propertySee Restatement (Second) § 68 comment d (1965).
 
 
 [9]
 Specifically, it says a state cannot invoke immunity "in a proceeding which relates to the determination of: (a) any right or interest of the State in, or its possession or use of, or any obligation of the State arising out of its interest in, or its possession or use of, immovable property situated in the State of the forum." U.N. Convention art. 13
 
 
 [10]
 By its terms, the U.N. Convention will go into force once 30 countries ratify it. As of September 30, 2005, 17 countries had done soSee http://untreaty. un.org/ENGLISH/bible/ englishi nternetbible /partI/chapterIII/treaty 38.asp. United States ratification is considered somewhat unlikely, for reasons wholly apart from the matter of the immovable property exception. See Stewart, The UN Convention, at 211 & n. 93.
 
 
 [11]
 Once again, whether and to what extent those rules apply and immunize the defendants from property taxation is a question for the district court to consider on the merits, not a jurisdictional bar from suit under the FSIA
 
 
 [12]
 In particular, at the time that the FSIA was enacted, the New York legislation at issue in this case was already in place, a fact that surely was known to the FSIA's drafters. Indeed, in a case that likely will be discussed at length as this action reaches the merits, the New York Court of Appeals had recently held that international law (including treaties to which the United States was a party) limited the City's ability to collect property taxes from foreign governmentsSee Republic of Argentina v. City of New York, 25 N.Y.2d 252, 303 N.Y.S.2d 644, 250 N.E.2d 698 (N.Y.1969). In doing so, the state court observed that the United States, while then advancing the position that the City's ability to tax should be limited, explicitly disclaimed the position that the court did not have the authority to make its own determination as to the applicability of international law to the facts of the case. Id. at 258 & n. 1, 303 N.Y.S.2d 644, 250 N.E.2d 698. It thus seems clear that, at the time of the FSIA's enactment, courts had jurisdiction to hear disputes such as this one. See also United States v. Glen Cove, 322 F.Supp. 149, 153 (E.D.N.Y.1971) (finding federal jurisdiction to hear dispute over city's taxation of property owned by foreign government).
 
 
 [13]
 Such obligations include only those imposed by the local government as part of its property law regime, and do not include standard tort liability. The FSIA contains a separate exception to immunity for suits arising out of "tortious act[s]" committed by foreign states and their employeesSee 28 U.S.C. § 1605(a)(5).
 
 
 [14]
 FollowingReclamantes, two other panels have denied jurisdiction under the immovable property exception on the ground that the disputes did not directly implicate present real property interests because the plaintiffs sought only money damages and not any adjudication of property rights. In MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918 (D.C.Cir.1987), a citizens' association alleged that the Republic of Peru had violated local zoning laws in remodeling a building for use as a chancery. The suit originally sought both injunctive relief and damages, but before any court could rule on the jurisdictional question, Peru voluntarily vacated the premises. As the suit stood by the time it reached the D.C. Circuit, the citizens' association did not seek to establish any rights in real estate, but rather sought damages in what was essentially a garden-variety tort claim, Republic of Peru found: "Upon analysis, the Association's complaint sounds not in the law of real property at all, but the law of nuisance." Id. at 921.
 A similar situation pertained in Fagot Rodriguez v. Republic of Costa Rica, 297 F.3d 1 (1st Cir.2002), where plaintiffs, who had rented a house to the Consul and Vice-Consul of the Republic of Costa Rica, sued over non-payment of rent and sought to evict the diplomats. By the time the case reached judgment, however, the defendants had vacated the premises, leaving only a dispute about unpaid rent and other damages. Accordingly, Republic of Costa Rica concluded, what was left was "a simple contract dispute over nonpayment of rent," jurisdiction over which would usually be provided by the commercial-activity exception instead. Id. at 12-13.
 As we read Republic of Peru and Republic of Costa Rica, they are cases about what it means for a property interest to actually be "in dispute." They thus spend little time exploring, and can tell us little about, what sorts of property interests would qualify. We neither express any opinion as to the correctness of their holdings (because there is no question that in the instant case the property interest involved is actually in dispute) nor attach much significance to their dicta regarding the types of property interests contemplated by the drafters of the FSIA.
 
 
 [15]
 By contrast, we decline to adopt the reasoning ofCity of Englewood v. Socialist People's Libyan Arab Jamahiriya, 773 F.2d 31 (3d Cir.1985), which involved facts very similar to those of this case. In that case, the New Jersey city of Englewood attempted to tax a parcel of real estate Libya used as a "weekend retreat" for its Head of Mission to the United Nations and his immediate family and guests. Id. at 33. City of Englewood simply recharacterized the immovable property exception as a "title dispute exception." Id. at 36. Because "[n]o one disputes Libya's title to the Englewood premises or its right to exclude others from possession thereof," it concluded, the exception did not apply. While the City attempts to distinguish City of Englewood based on differing details of New York and New Jersey tax law, there is no indication that City of Englewood took such considerations into account. Rather than try to distinguish City of Englewood, we respectfully find it unpersuasive, in light of our prior discussion.
 
 
 [16]
 The fact that the defendants' alleged obligations have converted into tax liens, and that this action thus seeks a declaration of the liens' validity in addition to a declaration of the defendants' underlying tax liability, is irrelevant to our analysis. We agree with the defendants that the City cannot use the device of a lien to create jurisdiction where none would otherwise lie, but we would reach the same result had this action been filed purely to obtain a declaratory judgment regarding defendants' property tax liability. Moreover, in simply affirming the district court's jurisdiction to hear this matter, we express no opinion as to whether a tax lien may be placed on diplomatic property
 
 
 [17]
 We note that the United States did not on its own initiative file a statement of interest, as it might have done, pursuant to 28 U.S.C. § 517. Rather, after briefing and argument by the parties, we solicited and have carefully considered the opinion of the United States in this matter, because the executive branch's views on matters implicating relations with foreign states are entitled to considerationSee Republic of Austria v. Altmann, 541 U.S. 677, 701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). However, "interpretation of the FSIA's reach [is] a pure question of statutory interpretation" that is "well within the province of the Judiciary," and so the United States' views "merit no special deference." Id. Indeed, among the purposes of the FSIA were relieving the executive branch of the responsibility of case-by-case application of the restrictive theory of sovereign immunity and assuring litigants that their cases would be decided according to the pure application of law rather than in accordance with diplomatic pressures. See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). It is particularly inappropriate to defer to the executive branch's legal views here because its position as to the proper scope of the immovable-property exception is inconsistent with its previous interpretation. As the United States acknowledges, the Department of Justice filed an amicus brief in 1985 in City of Englewood v. Socialist People's Libyan Arab Jamahiriya, 773 F.2d 31 (3d Cir.1985), arguing that the immovable property exceptions of Section 1605(a)(4) and of the European Convention were consonant with each other and that property tax liens implicated the FSIA's immovable property exception. We have, however, looked carefully at the United States' brief statement of potential foreign policy concerns associated with the assertion of jurisdiction in this case. While such concerns could perhaps merit a dismissal on other facts, cf. Garb v. Republic of Poland, 440 F.3d 579, 584 & n. 6 (2d Cir.2006); Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 59-60 (2d Cir.2005), we find none of the cited issues, presented in a largely vague and speculative manner, potentially severe enough or raised with the level of specificity required to justify presently a dismissal on foreign policy grounds. In the course of the proceedings remanded to the district court, the United States is, of course, free to file a further statement of interest if it thinks developments so warrant.
 
 
 [18]
 The United States suggests in passing that certain international fora may be more appropriate than our domestic courts for adjudication of controversies of this nature. No motion has been made to transfer this case to any other tribunal, and we express no opinion as to whether such a motion would have merit